**HAINES LAW GROUP, APC**
Paul K. Haines (SBN 248226)
*phaines@haineslawgroup.com*
Fletcher W. Schmidt (SBN 286462)
*fschmidt@haineslawgroup.com*
Ian T. Mallery (SBN 359132)
*imallery@haineslawgroup.com*
2155 Campus Drive, Suite 180
El Segundo, California 90245
Tel: (424) 292-2350
Fax: (424) 292-2355

*Attorneys for Plaintiffs and the Proposed Classes*
*[Additional Counsel on Following Page]*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

SHADI KRANITZ, an individual; DR. SHADI CONCIERGE MEDSPA, a California corporation; NICOLE KING, an individual; COSMO CONTOUR & SPA LLC, a California limited liability company; JENNIFER TABIZA, an individual; JENNIFER TABIZA OPTOMETRIST, APC, a California professional corporation; ELIZABETH FINNESSY, an individual; ELIZABETH S FINNESSY II DDS PLLC, a Washington professional limited liability company; CLINTON TIMMERMAN, an individual; CLINTON SCOTT TIMMERMAN, P.L.L.C., a Washington professional limited liability company; AMY DRAB, an individual; and AWAKEN FUNCTIONAL MEDICINE, PLLC, a Florida limited liability company, *on behalf of themselves and all others similarly situated*,

Plaintiffs,

v.

BTL INDUSTRIES, INC., a Delaware Corporation; MMP CAPITAL, INC., a New York Corporation; DEXT

Civil Case No.: 2:26-cv-02649-KAM-ARL

**SECOND AMENDED CLASS ACTION COMPLAINT**

***[SEEKS STATEWIDE OR NATIONWIDE RELIEF]***

**DEMAND FOR JURY TRIAL**

CAPITAL, LLC, a Delaware limited liability company; NORTH MILL CREDIT TRUST, a Delaware Association; AMUR EQUIPMENT FINANCE, INC., a Nebraska corporation; and DOES 1-10, inclusive,

Defendants.

**ZIMMERMAN REED LLP**
Caleb Marker (SBN 269721)
caleb.marker@zimmreed.com
Jeffrey Harrington (SBN 0327980) *Pro Hac Vice pending*
Jeffrey.harrington@zimmreed.com
Jessica Liu (SBN 358713)
jessica.liu@zimmreed.com
6420 Wilshire Blvd., Suite 1080
Los Angeles, CA 90048
(877) 500-8780 Telephone
(877) 500-8781 Facsimile

*Attorneys for Plaintiffs and the Proposed Classes*

**JANOVE PLLC**
Raphael Janove (SBN 5302443)
raphael@janove.law
115 Broadway, 5th Fl.
New York, NY 10006
(646) 347-3940 Telephone

*Local counsel for Plaintiffs and the Proposed Classes*

Plaintiffs Nicole King, Cosmo Contour & Spa LLC, Jennifer Tabiza, Jennifer Tabiza Optometrist, APC, Shadi Kranitz, Dr. Shadi Concierge Medspa, Elizabeth Finnessy, Elizabeth S Finnessy II DDS PLLC, Clinton Timmerman, Clinton Scott Timmerman, P.L.L.C., Amy Drab, and Awaken Functional Medicine, PLLC (together, "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their counsel, bring the following Second Amended Complaint against Defendants BTL Industries, Inc. ("BTL"), MMP Capital, Inc. ("MMP"), Dext Capital, LLC ("DEXT"), North Mill Credit Trust ("NORTH MILL"); Amur Equipment Finance, Inc. ("AMUR") and DOES 1-10 (collectively referred to herein as "Defendants").

## I. NATURE OF THE ACTION

1. Plaintiffs bring this action individually, and on behalf of all other similarly situated purchasers of cosmetic medical devices produced, sold, and/or financed by Defendants, who were induced through Defendants' false pretenses to enter fraudulent, misleading and deceptive sales and financing agreements with the Defendants to purchase cosmetic medical devices.

2. This class action arises from Defendant BTL's fraudulent, deceptive and exploitative marketing and sales practices in the medical aesthetics industry, a highly unregulated market. The medical aesthetics industry has grown exponentially in recent years, with aesthetic medical device manufacturers aggressively marketing their products to physicians, med spa owners, and other healthcare professionals as lucrative revenue-generating tools.

3. Defendant BTL marketed these devices as profitable devices promising high revenues, that came with marketing and advertising support to purchasers that would generate leads, but failed to provide such support.

4. Defendant BTL facilitated financing through third party lenders, including Defendants MMP, DEXT, TIMEPAYMENT, NORTH MILL, and AMUR, inducing Plaintiffs through false pretenses to enter high-interest financing agreements

amassing hundreds of thousands of dollars of debt.

5. Defendants MMP, DEXT, TIMEPAYMENT, NORTH MILL, and AMUR knew or should have known that BTL was supplying them with falsified or otherwise grossly inaccurate data and financial documents in order to secure loans for Plaintiffs and the Class Members. Defendants MMP, DEXT, TIMEPAYMENT, NORTH MILL, and AMUR also knew or should have known that the terms of these loans were materially misrepresented to Plaintiffs at the time they were signed.

6. Defendant BTL lures doctors, nurses, and medical spa owners into financing their cosmetic medical devices by "wining and dining" them at extravagant sales conferences, over-inflating, or blatantly misrepresenting potential sales projections for treatments they can then sell to their clients.

7. Defendant BTL promised post-purchase marketing support to drive sales to Plaintiffs' businesses, including business-tailored billboard advertisements, promotional videos, online advertising, and sales referrals. The support that was actually provided, however, fell far short of what Defendant BTL had promised.

8. In March 2025, BTL boasted of becoming the "fastest-growing non-invasive facial lifting procedure" when its EMFACE treatment surpassed one million treatments administered in just two years.[1] In January 2026, BTL reported global revenue in excess of $850 million, "underpinned by robust and sustained growth in North America."[2]

9. Defendant BTL's growth in four short years is marked, with upwards of 3,000 employees, 500+ engineers and a presence in over 80 countries. This growth hinges in large part on Defendant BTL convincing small business owners of boutique

---

[1] https://www.prnewswire.com/news-releases/btls-emface-surpasses-1-million-treatments-becoming-the-fastest-growing-non-invasive-facial-lifting-procedure-302390226.html?utm_

[2] https://www.prnewswire.com/news-releases/btl-reports-global-revenue-exceeding-850-million-and-signals-accelerating-growth-in-north-america-for-2026-302670273.html

clinics, or medical spas, like Plaintiffs to often finance six figure, high-interest loans to purchase its devices such as EMFACE, EMSCULPT NEO, EMSELLA, and others.

10. Defendant BTL maintains an aggressive marketing and sales campaign including extravagant luxury trips all over the world, targeted toward Plaintiffs and those similarly situated.

11. Defendant BTL intentionally communicated and agreed to "terms of the agreement," primarily verbally, and often refused to document commitments in emails or other writings.

12. Defendant BTL funneled Plaintiffs and putative class members to select financing companies including Defendants MMP, DEXT, NORTH MILL, and AMUR, who also facilitated the high-interest loans. Like these other questionable and unlawful business practices, Defendant BTL's fraudulent, misleading and deceptive sales practices allow it to take advantage of practitioners who, after being fraudulently induced by Defendants to purchase BTL devices, become burdened with crippling, business-shuttering debt.

13. Defendant BTL facilitated financing through third party lenders, including Defendants MMP, DEXT, NORTH MILL, and AMUR, inducing Plaintiffs through false pretenses to enter high-interest financing agreements amassing hundreds of thousands of dollars of debt.

14. Defendants MMP, DEXT, NORTH MILL, and AMUR knew or should have known that BTL was supplying them with falsified or otherwise grossly inaccurate data and financial documents in order to secure loans for Plaintiffs and the Class Members. Defendants MMP, DEXT, NORTH MILL, and AMUR also knew or should have known that the terms of these loans were materially misrepresented to Plaintiffs at the time they were signed.

15. Plaintiffs thus bring this action pursuant to: (i) California's Business & Professions Code §§ 17200, *et seq.* (the Unfair Competition Law or "UCL"); (ii)

California's Business and Professions Code §§ 17500, *et seq.* (the False Advertising Law or "FAL"); (iii) California's Business & Professions Code §§ 16700, *et seq.* (the Cartwright Act); (iv) California Civil Code § 1689; (v) the Robinson-Patman Act, 15 U.S.C. § 13, *et seq.*; (vi) Massachusetts' Consumer Protection Act, Mass. General Laws Ch. 93A; (vii) New York's Deceptive Trade Practices Act, New York General Business Law § 349, *et seq.*; (viii) New York's Commercial Finance Disclosure Law, 23 N.Y. Comp. Codes R. & Regs. § 600, *et seq.*; (ix) Washington's Consumer Protection Act, Rev. Code of Wash. § 19.86, *et seq.*; and common law claims described herein.

16. Plaintiffs bring this action on behalf of a nationwide class and California, Florida, and Washington subclasses for damages, restitution, and injunctive relief, and any other relief deemed appropriate by the court to which this case is assigned.

## II. JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d), as there is minimal diversity, there are over 100 class members, and the amount in controversy exceeds the sum of $5 million, exclusive of interest and costs.

18. This Court has personal jurisdiction over Defendants because Defendants are corporations, limited liability companies, or other business entities authorized to conduct and who do conduct business in the State of New York. Defendants conduct sufficient business with sufficient minimum contacts in New York, and/or otherwise intentionally avail themselves of the New York market through their promotion, sales, distribution, marketing, and financing within this State to render the exercise of jurisdiction by this Court permissible.

19. Venue is proper under 28 U.S.C. § 1391(b)(2) because Defendants transact substantial business in this District. A substantial part of the events giving rise to Plaintiffs' claims arose here.

20. Venue and jurisdiction are also proper in this Court due to the existence of contractual forum selection and choice of law clauses in the various contracts signed by Plaintiffs with Defendants.

21. While Plaintiffs are challenging the enforceability of the contracts as a whole and are reserving all rights to challenge the enforceability of all of the contracts and clauses contained therein, the Honorable District Judge David O. Carter previously ruled that the venue selection clauses were prima facie valid, and found that jurisdiction was present in the Eastern District of New York.

22. Additionally, Judge Carter also previously ruled that Plaintiffs' claims against all Defendants "are so intertwined, it would be a waste of judicial resources for these claims to be litigated in different forums across the country" and that "[t]herefore, the Court will be using its discretion to ensure that all the claims in this case are litigated together in one forum." *See* C.D. Cal. Docket Entry No. 104.

## III. PARTIES

### A. PLAINTIFFS

#### 1. Nicole King and Cosmo Contour & Spa LLC

23. Plaintiff Nicole King, at all times mentioned herein was an individual citizen of the State of California and resident of Los Angeles County.

24. Plaintiff Cosmo Contour & Spa LLC, at all times mentioned herein, was a California Limited Liability Company with its principal place of business in Los Angeles County, and was owned by Plaintiff Nicole King.

25. On or about November, 2021, Plaintiff Nicole King, through Plaintiff Cosmo Contour & Spa LLC, purchased BTL's "Emsculpt Neo" device, with an equipment financing agreement through Defendant MMP, which was assigned to Defendant AMUR two days later.

26. On or about October 2022, Plaintiff Nicole King, through Plaintiff Cosmo Contour & Spa LLC, purchased BTL's "Emface" device, with an equipment financing agreement through DEXT.

27. Although Plaintiff Cosmo Contour & Spa LLC signed the purchase agreements, the purchase agreements required Plaintiff Nicole King to personally guarantee the agreements.

28. Defendants BTL, MMP, AMUR, and DEXT, individually and/or as members of and engaged in a joint venture, partnership, and common enterprise, and acting within the course and scope of and in pursuance of said joint venture, partnership, and common enterprise,  induced these purchases through fraudulent, deceptive, and/or misleading statements, representations, and/or omissions.

**2. Jennfier Tabiza and Jennifer Tabiza Optometrist, APC**

29. Plaintiff Jennifer Tabiza, at all times mentioned herein was an individual citizen of the State of California and resident of Los Angeles County.

30. Plaintiff Jennifer Tabiza Optometrist, APC, at all times mentioned herein, was a California Professional Corporation, with its principal place of business in Los Angeles County, and was owned by Plaintiff Jennifer Tabiza.

31. Between October 2022 and December 2022, Plaintiff Jennifer Tabiza, through Plaintiff Jennifer Tabiza Optometrist, APC, purchased BTL's "Emface," "Emsculpt Neo," "Emsella" and "Emtone" devices, with financing agreements through MMP for all devices except the Emsella, which was through non-party TimePayment.

32. However, upon information and belief, MMP subsequently assigned the Emface financing agreement to DEXT, the Emsculpt Neo agreement to NORTH MILL, and the Emtone agreement to AMUR.

33. Although it was Plaintiff Jennifer Tabiza Optometrist, APC that signed the purchase agreements, the purchase agreements required Plaintiff Jennifer Tabiza to personally guarantee the agreements.

34. Defendants BTL, MMP, NORTH MILL, and AMUR, individually and/or as members of and engaged in a joint venture, partnership, and common enterprise, and acting within the course and scope of and in pursuance of said joint

venture, partnership, and common enterprise, induced these purchases through fraudulent, deceptive, and/or misleading statements, representations, and/or omissions.

**3. Shadi Kranitz and Dr. Shadi Concierge Medspa**

35. Plaintiff Shadi Kranitz, at all times mentioned herein was an individual citizen of the state of California and resident of Orange County.

36. Plaintiff Dr. Shadi Concierge Medspa, a California Corporation, at all times mentioned herein was a California Corporation, with its principal place of business in Orange County, and was owned by Plaintiff Shadi Kranitz.

37. Between March 2023 and May 2023, Plaintiff Shadi Kranitz, through Plaintiff Dr. Shadi Concierge Medspa, purchased BTL's "Emface" and "Exion" devices, with financing through MMP.

38. Eight days after the financing agreement for the Emface device was executed, MMP assigned the agreement to Defendant NORTH MILL.

39. Ten days after the financing agreement for the Exion device was executed, MMP assigned the agreement to Defendant AMUR.

40. Although it was Plaintiff Dr. Shadi Concierge Medspa that signed the purchase agreement, the agreement required Plaintiff Shadi Kranitz to personally guarantee the agreement.

41. Defendants BTL, MMP, NORTH MILL, and AMUR, individually and/or as members of and engaged in a joint venture, partnership, and common enterprise, and acting within the course and scope of and in pursuance of said joint venture, partnership, and common enterprise, induced this purchase through fraudulent, deceptive, and/or misleading statements, representations and/or omissions.

**4. Amy Drab and Awaken Functional Medicine, PLLC**

42. Plaintiff Amy Drab, at all times mentioned herein was an individual citizen of the state of Florida and resident of Florida.

43. Plaintiff Awaken Functional Medicine, PLLC, was at all times mentioned herein a Florida limited liability company with its principal place of business in Okaloosa County, Florida, and was owned by Plaintiff Amy Drab.

44. Between September and December 2023, Plaintiff Amy Drab, through Plaintiff Awaken Functional Medicine, PLLC, purchased BTL's "Emsculpt Neo," "Emsella" and "Cellutone" devices (although the Cellutone device was presented as a "free gift"), with financing through MMP.

45. Four days after the financing agreement for the Emsculpt Neo device was executed, MMP assigned the agreement to Defendant NORTH MILL.

46. Four days after the financing agreement for the Cellutone was executed, MMP assigned the agreement to non-party NEC Financial Services, LLC.

47. Although Plaintiff Amy Drab initially completed financing paperwork for the Emsella device with MMP in December 2023, the financing was thereafter taken over by non-party Quality Leasing Co., Inc., although Plaintiff is currently unaware of the exact timing or method by which the debt was transferred to Quality Leasing Co.

48. Although it was Plaintiff Awaken Functional Medicine, PLLC that signed the purchase agreements, the agreements required Plaintiff Amy Drab to personally guarantee the agreements.

49. Defendants BTL, MMP, and NORTH MILL, individually and/or as members of and engaged in a joint venture, partnership, and common enterprise, and acting within the course and scope of and in pursuance of said joint venture, partnership, and common enterprise, induced this purchase through fraudulent, deceptive, and/or misleading statements, representations and/or omissions.

**5. Elizabeth Finnessy and Elizabeth S Finnessy II DDS PLLC**

50. Plaintiff Elizabeth Finnessy, at all times mentioned herein was an individual citizen of the state of Washington and resident of Washington.

51. Plaintiff Elizabeth S Finnessy II DDS PLLC, was at all times mentioned

herein a Washington professional limited liability company with its principal place of business in King County, Washington, and was owned by Plaintiff Elizabeth Finnessy.

52. Between August and November 2024 Plaintiff Elizabeth S. Finnessy II DDS PLLC purchased BTL's "Emface," "Exion," Emsculpt Neo," and "Emsella" devices, with financing through MMP.

53. On the same date that the financing agreements for the Emface and Exion were executed, MMP assigned the agreement to AMUR. Seven days after the financing agreements for the Emsculpt Neo and Emsella were executed, MMP assigned the agreements to NORTH MILL.

54. Although it was Plaintiff Elizabeth S Finnessy II DDS PLLC that signed the purchase agreements, the agreements required Plaintiff Elizabeth Finnessy to personally guarantee the agreements.

55. Defendants BTL, MMP, AMUR, and NORTH MILL, individually and/or as members of and engaged in a joint venture, partnership, and common enterprise, and acting within the course and scope of and in pursuance of said joint venture, partnership, and common enterprise, induced these purchases through fraudulent, deceptive, and/or misleading statements, representations and/or omissions.

**6. Clinton Timmerman and Clinton Scott Timmerman PLLC**

56. Plaintiff Clinton Timmerman, at all times mentioned herein was an individual citizen of the state of Washington and resident of Washington.

57. Plaintiff Clinton Scott Timmerman PLLC, was at all times mentioned herein a Washington professional limited liability company with its principal place of business in Snohomish County, Washington, and was owned by Plaintiff Clinton Timmerman.

58. In December 2024 Plaintiff Clinton Scott Timmerman PLLC purchased BTL's "Emface" and "Exion" devices, with financing through MMP.

59. Twenty-six days after the financing agreement for the Exion device was executed, MMP assigned the agreement to NORTH MILL. Although it was Plaintiff Clinton Scott Timmerman PLLC that signed the purchase agreements, the agreements required Plaintiff Clinton Timmerman to personally guarantee the agreements.

60. Defendants BTL, MMP, and NORTH MILL, individually and/or as members of and engaged in a joint venture, partnership, and common enterprise, and acting within the course and scope of and in pursuance of said joint venture, partnership, and common enterprise, induced this purchase through fraudulent, deceptive, and/or misleading statements, representations and/or omissions.

## B. DEFENDANTS

### 1. BTL

61. Defendant BTL is a privately owned global manufacturer of medical and aesthetic equipment, namely Emsculpt Neo, Emsculpt Classic, Emface, Emsella, EmTone, Exion, and ExoMind devices.

62. BTL is incorporated under the laws of Delaware, with its principal place of business in Massachusetts with offices located at 362 Elm St, Ste #5, Marlborough, MA 01752 and thus is a citizen of Delaware and Massachusetts.

63. BTL has engaged in business in the state of New York by selling and delivering equipment to consumers throughout New York, which it also does throughout the United States. According to BTL's "provider directory" on its website, BTL identifies more than 400 businesses in New York state that are utilizing BTL devices.

64. BTL holds multiple U.S. patents covering its proprietary High-Intensity Focused Electromagnetic (HIFEM) technology, which is central to the Emsculpt Neo body-contouring device and other non-invasive body-shaping procedures. BTL has actively enforced its patent rights against competitors to protect its exclusive use of the patented technology. Although BTL's patents provide significant protection for

its HIFEM technology, other companies may hold patents relating to alternative muscle-stimulation and body-contouring methods.

65. At all times mentioned herein, BTL was a member of and engaged in a joint venture, partnership, and common enterprise, and were acting within the course and scope of and in pursuance of said joint venture, partnership, and common enterprise, with MMP and with DEXT, AMUR, and NORTH MILL.

**2. MMP**

66. Defendant MMP is a privately owned financial services company specializing in equipment financing and unsecured capital financing.

67. MMP is incorporated under the laws of New York with an office located at 19 Engineers Lane, Farmingdale, New York 11735 and thus is a citizen of New York. MMP has engaged in business in the state of New York by entering into equipment finance agreements with purchasers of BTL devices throughout New York, which it also does throughout the United States.

68. At all times mentioned herein, MMP was a member of and engaged in a joint venture, partnership, and common enterprise, and were acting within the course and scope of and in pursuance of said joint venture, partnership, and common enterprise, with BTL and with DEXT, AMUR, and NORTH MILL.

**3. DEXT**

69. Defendant DEXT is a privately owned financial services company specializing in medical equipment financing.

70. DEXT is organized under the laws of Delaware with an office located at 4000 Kruse Way Place, Building 3, Suite #100, Lake Oswego, Oregon 97035 and thus is a citizen of Oregon. DEXT has engaged in business in the state of New York by entering into equipment finance agreements with purchasers of BTL devices throughout New York, which it also does throughout the United StatesAt all times mentioned herein, DEXT was a member of and engaged in a joint venture, partnership, and common enterprise, and were acting within the course and scope of

and in pursuance of said joint venture, partnership, and common enterprise, with MMP and BTL.

**4. AMUR**

71. Defendant AMUR is a privately owned financial services company specializing in equipment financing.

72. AMUR is organized under the laws of Nebraska with an office located at 304 W. 3rd Street, Grand Island, Nebraska 68801, and thus is a citizen of Nebraska. AMUR has engaged in business in the state of New York by entering into equipment finance agreements with purchasers of BTL devices throughout New York, which it also does throughout the United States.

73. At all times mentioned herein, AMUR was a member of and engaged in a joint venture, partnership, and common enterprise, and were acting within the course and scope of and in pursuance of said joint venture, partnership, and common enterprise, with MMP and BTL.

**5. NORTH MILL**

74. Defendant NORTH MILL is a Delaware association that engages in equipment financing.

75. NORTH MILL is organized under the laws of Delaware with an office located at 50 Washington Street, Suite 1211, South Norwalk, CT 06854 and thus is a citizen of Connecticut. NORTH MILL has engaged in business in the state of New York by entering into equipment finance agreements with purchasers of BTL devices throughout New York, which it also does throughout the United States.

76. At all times mentioned herein, NORTH MILL was a member of and engaged in a joint venture, partnership, and common enterprise, and were acting within the course and scope of and in pursuance of said joint venture, partnership, and common enterprise, with MMP and BTL.

**6. DOES 1 Through 10**

77. Plaintiffs do not know the true names or capacities, whether individual,

partner, or corporate, of the defendants sued herein as DOES 1 through 10, and for that reason, said defendants are sued under such fictitious names, and Plaintiffs will seek leave of this Court to amend this Complaint when such true names and capacities are discovered. Plaintiffs are informed and believe, and based thereon allege, that each of said fictitious defendants, whether individual, partner, or corporate, were responsible in some manner for the acts and omissions alleged herein, and proximately caused Plaintiffs to be subject to the unlawful practices, wrongs, injuries, and damages complained of herein.

## IV. FACTUAL ALLEGATIONS

78. Between November 2021 and December 2024 Plaintiffs collectively purchased fifteen different devices from BTL, with purchase prices ranging as follows:

a) Plaintiff Nicole King purchased the Emsculpt Neo in November 2021 for approximately $197,000;

b) Plaintiff Jennifer Tabiza purchased the Emface in September 2022 for approximately $200,000;

c) Plaintiff Jennifer Tabiza purchased the Emsculpt Neo in September 2022 for approximately $220,000;

d) Plaintiff Nicole King purchased the Emface in October 2022 for approximately $166,000;

e) Plaintiff Jennifer Tabiza purchased the Emsella in December 2022 for approximately $145,000;

f) Plaintiff Jennifer Tabiza purchased the Emtone in December 2022 for approximately $165,000;

g) Plaintiff Shadi Kranitz purchased the Emface in March 2023 for approximately $249,000;

h) Plaintiff Shadi Kranitz purchased the Exion in May 2023 for approximately $105,000;

i) Plaintiff Amy Drab purchased the Emsculpt Neo in September 2023 for approximately $372,000;[3]

j) Plaintiff Amy Drab purchased the Emsella in December 2023 for approximately $125,000;

k) Plaintiff Elizabeth Finnessy purchased the Emface and Exion devices in August 2024 for a combined price of approximately $232,000;

l) Plaintiff Elizabeth Finnessy purchased the Emsculpt Neo and Emsella devices in November 2024 for a combined price of approximately $223,000;

m) Plaintiff Clinton Timmerman purchased the Emface and Exion devices in December 2024 for a combined price of approximately $265,000.

79. Each of these devices was financed through third-party equipment financing companies exclusively arranged by BTL, including Defendants MMP, DEXT, NORTH MILL, and AMUR, and after including the financing charges, the total commitment for the fifteen devices collectively was well in excess of $3 million dollars.

80. BTL is a privately owned manufacturer of Medical and Aesthetic Equipment with the sole patent in the United States for the Emsculpt Neo body-contouring device and other non-invasive body-shaping devices and procedures, including Emsculpt Classic, Emface, Emsella, Emtone, Exomind, and Exion. The company actively restricts the importation of products into the United States that infringe BTL's patents; thus, BTL has a monopoly on these particular products in the

[3] As part of Plaintiff Drab's purchase of the Emsculpt Neo device, BTL sales representative Kristopher Huston offered to include a Cellutone device for free. However, when the financing agreements were drawn up, BTL and MMP created two separate financing agreements for the two devices and assigned the Cellutone device a value of $158,585, and the Emsculpt Neo a value of $213,440. Plaintiff Drab now believes this was done simply to allow the loan to be split into two smaller loans to evade underwriting guidelines through a "split" transaction as discussed in more detail below.

United States.

81. Defendant BTL, a major manufacturer of medical aesthetic devices, markets its devices as breakthrough technologies capable of generating substantial revenue for medical practices and spas. Its flagship products, including Emsculpt Neo, Emsculpt Classic, Emface, Emsella, Emtone, Exomind, and Exion, are promoted as offering revolutionary treatment options that will significantly enhance purchaser revenue streams through increased patient demand, as well as geographically limited and price restricted markets. These market restrictions, imposed by BTL, allowed BTL to represent to potential purchasers that they would be able to sell treatments at inflated rates, which were rarely achievable in practice.

82. Defendant BTL claims its devices are supported by extensive marketing assistance and guaranteed sales leads for purchasers, which are touted as essential components of the devices' profitability, in addition to territorial and price controls which are designed to regulate the supply and demand for the treatments.

83. Manufacturers like Defendant BTL employ aggressive sales tactics designed to exploit potential customers. Medical professionals, including physicians and med spa owners with limited business experience are lured by Defendants' promises of high profitability, a protected market, and comprehensive marketing support that, in reality, are never delivered.

84. The six-figure prices for these devices requires a large investment up front necessitating private financing, accruing high interest rates and other financing charges and the purchase of equipment protection insurance. The average med spa owner will invest in not just one device for one part of the body but several devices, sometimes amassing over half a million dollars in principal for financing in one agreement.

Defendant BTL's sales strategy begins with broad marketing campaigns, promotional materials, and high-pressure in-person sales efforts. Sales representatives assure prospective customers that purchasing Defendant BTL's

devices will result in substantial revenue increases for their businesses, and even promises of protecting their "corner on the market" in a particular geographic area, driven by Defendant BTL's purported marketing leads, advertising campaigns, and patient referrals. These promises are made repeatedly in presentations, promotional materials, and verbal assurances by Defendant's representatives.

85. Defendant BTL purposefully misleads potential purchasers based on inflated, misleading and/or fabricated usage and sales data for the devices.

86. One of the tactics BTL employs is to use paid sales representatives who also own and operate medspas featuring BTL devices, without disclosing that the individuals are **paid salespeople**. BTL then funnels significant resources including promotion and client referrals to the medspas owned by the paid sales representatives, and then uses these success stories to sell potential clients on the profitability of the BTL devices. However, in reality, the medspa owners being promoted as success stories by BTL are being significantly propped up by additional support from BTL, not provided to other device purchasers, and by the commissions that they earn from sales of new devices.

87. BTL's paid sales representatives are also paid to speak at sales events and conferences hosted by BTL, where they present PowerPoint presentations BTL created to promote the success of their spas without disclosing that they are being paid to promote BTL devices and that they will earn commissions on any devices sold at the sales events and conferences. In many instances, purchasers of BTL devices view the speaking fees and commissions as the only way to generate revenue once they realize that the demand for the treatments simply does not exist at the prices that BTL mandates. However, BTL will often condition the speaking engagements on the spokespeople purchasing additional devices. For example, Plaintiff Finnessy was offered several paid speaking engagements after purchasing her devices, but was told that in order to be offered additional speaking opportunities, she would need to purchase the Exomind device, which she was unwilling to do.

88. In September 2023, Kristopher Huston connected Plaintiff Drab with another provider in Florida who had recently purchased the Emsculpt Neo, who spoke highly of the device and earned an undisclosed $5,000 in exchange for assisting to close the sale. However, this individual later told Plaintiff Drab that she regretted influencing her and other providers into purchasing the device and admitted that in reality she was unhappy with the device.

89. In approximately March 2023, Defendant BTL's Sales Representative Al Cervantes and Brad (last name presently unknown) took Plaintiff Kranitz to tour another medspa in Huntington Beach that featured BTL devices. However, the Huntington Beach medspa that Cervantes and Brad took Kranitz to tour was in fact owned by a paid nationwide sales representative for BTL who stood to earn a $5,000 commission on any BTL devices purchased by Kranitz, and this material fact was fraudulently concealed from Kranitz.

90. Cervantes and Brad showed Kranitz fabricated or misleading sales data that indicated that the owner of the Huntington Beach medspa had increased her revenue from $60,000 per month to $4 million per year after purchasing BTL devices, and Kranitz now believes this representation to be false. This data was generated by showing the usage statistics from the devices located at the Huntington Beach medspa, and representing that the treatments were all being sold at full price. However, in actuality, Defendant BTL, through its agents including Cervantes and Brad, were utilizing the Huntington Beach medspa as a BTL showroom, where they would frequently send interested purchasers, their staff, and their families to receive complimentary treatments, **completely free of charge**, and would compensate the owner of the Huntington Beach medspa with commissions on any devices sold as a result. This resulted in grossly inflated usage data that did not in any way indicate the true price consumers in the market would be willing to pay for these treatments nor the market potential of the devices. Defendant BTL was aware that these statistics were grossly inflated, but actively promoted the success of the Huntington Beach

medspa as indicative of the market potential of the devices.

91. Defendant BTL, through its agents including John Ferris, BTL's Vice President of US Marketing, as well as Cervantes and Brad, also included these inflated statistics in presentations that were presented at large sales conferences throughout the country. Specifically, in May 2023 John Ferris prepared a powerpoint presentation on behalf of the owner of the Huntington Beach medspa that specifically identified the free treatments as having been sold for $1,000 per treatment on the Emface device and $850 per treatment on the Emsculpt Neo, and explicitly represented that the medspa had made a profit of approximately $275,000 over the course of just the first two months of owning the Emface and Emsculpt Neo devices. *See* **Exhibit A** (relevant excerpts from powerpoint presentation). In reality, the medspa had not made any profit at all and was operating at a significant loss.

92. The powerpoint presentation also included an infographic created by BTL titled "Emsculpt Neo By The Numbers" which included the falsified usage data, and also included a "California Quarterly Summary" indicating that BTL providers were selling 50 treatments on average per quarter. *See* **Exhibit A**. Plaintiffs believe these statistics are also false and/or misleading, and at a minimum are being skewed by the fraudulent usage data intentionally created by BTL. Upon information and belief, this infographic and others like it were used by BTL at numerous sales conferences and presentations throughout the country.

93. Similarly, on July 11, 2024, while attempting to sell an Emface device to Plaintiff Finnessy, Defendant BTL's Territory Manager for the Pacific Northwest, Tim Kerr, told Plaintiff Finnessy in an e-mail that "Average practices across the Pacific Northwest average 26 treatments a month. Treatments range from $900-$1,000/session which is $3,600-$4,000 for the series of 4". *See* **Exhibit B**. Plaintiff Finnessy assumed that this statistic was truthful, and it played a significant role in convincing her to purchase the Emface device. However, after purchasing the device and realizing that there was nowhere near enough patient demand to sell 26

treatments per month, Plaintiff Finnessy began asking for the identities of other practices in the Pacific Northwest who were selling high volumes of treatments and BTL was unable to identify any such practices. Plaintiff Finnessy now believes the claim that practices in the Pacific Northwest were selling 26 Emface treatments per month on average to be completely false.

94. Upon information and belief, Defendant BTL utilized these same tactics in other geographic markets throughout the country.

95. During the sales process, Plaintiffs King, Kranitz and Tabiza primarily communicated with BTL representatives Dean Boyle, Vincent Perri, Louis Chambers, Al Cervantes, and Brad (last name presently unknown), who were at the time BTL's Area Sales Manager, Area Sales Director, Regional Sales Director, and Sales Representatives, all responsible for the territory that included Los Angeles and Orange Counties.

96. Plaintiff Drab primarily communicated with BTL representative Kristopher Huston who was at the time BTL's Director of Strategic Business Growth for the territory in Florida including Plaintiff Drab's location.

97. Plaintiffs Finnessy and Timmerman primarily communicated with BTL representatives Tim Kerr, Brad Guthrie, and Brad Schwartz who were at the time BTL's Territory Manager, Regional Sales Director, and Area Vice President responsible for the Pacific Northwest territory.

98. While BTL was attempting to persuade Plaintiffs into purchasing devices, its sales representatives made the same verbal representations to each of them: that BTL would provide substantial marketing and customer procurement support, and assured Plaintiffs that BTL possessed a substantial customer referral network that would be deployed for their benefit after purchase.

99. For example, Dean Boyle verbally represented to Plaintiff Nicole King that BTL would provide a promotional billboard to promote her spa that was never

provided. Although the representation was made verbally, this promise was referenced in a March 3, 2023 text message from Dean Boyle to Plaintiff Nicole King.

100. Similarly, while inducing Plaintiff Kranitz to purchase the Emface device, BTL Sales Representatives Cervantes and Brad represented that Kranitz would receive six months of marketing and promotional support from Medvelocity Group and RepeatMD, and a custom promotional video. None of these services generated any revenue or results, falling far short of what had been promised. RepeatMD refused to provide services unless Plaintiff Kranitz agreed to commit to paying for services beyond the six-month introductory period, and when Plaintiff Kranitz declined to do so, RepeatMD ceased engagement. Despite BTL's representations, no contractual enforcement of RepeatMD's obligations was available to Plaintiff Kranitz. Medvelocity failed to ever produce a promotional video. Plaintiff Kranitz eventually contracted with a third party, at her own expense, to produce a video advertising the BTL treatments available at her Medspa.

101. BTL representatives presented to Plaintiffs that their marketing and promotional support would manifest as "rebates," which Plaintiffs could "cash in" by seeking reimbursement from BTL after making advertising purchases. These rebates were often valued in excess of $25,000. Upon information and belief, Plaintiffs and similarly situated purchasers were rarely able to obtain reimbursement for the full amounts they were promised by BTL. However, Plaintiffs and other similarly situated purchasers were still caused to finance the value of these purported "rebates" as part of the total purchase price of the devices, thereby forcing Plaintiffs to pay increased interest and financing charges resulting from the increased principal value of the loan. Furthermore, this practice increased the disconnect between the true market value of the collateral and the amount being financed, effectively placing the purchaser underwater from day one, and placing the purchaser at an increased risk of personal liability in the event of default.

102. BTL representatives also made numerous representations to Plaintiffs

that they would not be competing with other businesses utilizing BTL devices in their immediate vicinity, and sold Plaintiffs on a highly-controlled marketplace that would disallow competitors from undercutting them on pricing. However, these promises now appear to have been completely false and in fact there were numerous business competitors selling BTL treatments in Plaintiffs' direct geographic vicinities.

103. For example, on approximately November 2021, Louis Chambers verbally represented to Plaintiff Nicole King that the Emsculpt Neo device would be sold only to a limited number of providers within her geographic area in order to minimize direct competition. Similarly, on approximately October 2022 when the Emface device was being launched, Louis Chambers verbally represented to Plaintiff Nicole King that Cosmo Contour & Spa LLC had been selected as one of only five providers in the geographic area to be given the opportunity to purchase the Emface device. However, neither of these representations were ultimately true.

104. Similarly, on September 21, 2022, Vincent Perri and Louis Chambers met with Plaintiff Jennifer Tabiza, during which they verbally promised that BTL would provide promotional billboards, client leads, and other marketing support if she purchased BTL devices. During the meeting, Vincent Perri and Louis Chambers also showed Plaintiff Jennifer Tabiza sales and revenue data, purportedly showing how profitable the Emsella device had been for other providers. Plaintiff Jennifer Tabiza now believes that this sales and revenue data was inflated and/or fabricated.

105. Similarly, in approximately March 2023, Sales Representative Cervantes and Brad emphasized to Plaintiff Kranitz that she would be the only owner of an Emface device in her geographic territory, which Kranitz relied upon in deciding to move forward with the purchase. However, this representation also turned out to be false.

106. Similarly, in approximately July 2024, BTL representative Tim Kerr told Plaintiff Finnessy that BTL had identified her practice as an ideal candidate for BTL devices, and that she had been "chosen" to have the opportunity to purchase

BTL devices. Tim Kerr told Plaintiff Finnessy that there would be a protected radius around her practice in Bellevue, Washington, and that she would be the only practice within that radius that they would sell any devices to. However, Plaintiff Finnessy later became aware after agreeing to purchase the devices that BTL had sold the same devices to multiple other practices in her immediate vicinity.

107. Tim Kerr made similar representations to Plaintiff Timmerman, including that BTL would promote a launch party for his devices that would include providing a BTL-branded recreational vehicle onsite to promote the event, and that BTL devices, and in turn the local BTL providers, would be advertised through billboards at SeaTac airport. However, no recreational vehicle was ever delivered for the launch party, and no billboards were ever erected at SeaTac airport to Plaintiff Timmerman's knowledge.

108. BTL delivered on only a fraction of the post-purchase support it promised, including failing to produce promotional billboards that were promised to Plaintiffs, and failing to follow through on promises to promote Plaintiffs' businesses in magazines. BTL also failed to deliver on its promises of customer referrals, which were essentially non-existent.

109. BTL representatives also misled Plaintiffs regarding the requirement that the devices be operated only by a licensed physician or under the supervision of a medical director. For example, in an e-mail sent on July 11, 2024, BTL sales representative Tim Kerr told Plaintiff Finnessy, who is a licensed dentist but not a medical doctor, that the operation of the Emface device was "completely delegatable to staff so you won't need to be present while the treatments are ongoing." *See* **Exhibit B**. However, after purchasing the device in reliance on this representation, Plaintiff Finnessy learned that the Emface and other BTL devices are prescriptive-only medical devices that can only be legally operated by a licensed physician or under the supervision of a medical director. This meant that as a dentist, Plaintiff Finnessy would be required to hire a medical director in order to legally operate the

device, and could not delegate any operation to her staff.

110. In August 2025, BTL employee Chelsie Rich, who was assigned to be Plaintiff Finnessy's "Practice Success Manager," verbally acknowledged that Plaintiff Finnessy had been misled regarding the requirement to have a medical director supervise the operation of BTL devices, stating "you've been lied to," and "it's a serious thing…I'm sorry you feel bamboozled." During the same conversation, Chelsie Rich referenced at least one other dentist in another state who had purchased BTL devices on the representation that he could legally operate them, who was also blindsided upon learning that his operation of the devices would require hiring a medical director. Plaintiffs have also been contacted by a dentist in California who says that she was also misled into purchasing a BTL device on the belief that she could legally operate the device as a dentist, but later learned that she would also need to hire a medical director which she could not afford to do.

111. Plaintiffs are also aware that BTL sales representatives will routinely tell prospective purchasers that if they are not physicians and do not employe a medical director, they can simply borrow the medical license number of a medical director at a BTL-affiliated spokesperson's practice for purposes of obtaining insurance coverage, financing, and complying with local rules and regulations.

112. By agreeing to purchase BTL devices, Plaintiffs were required to comply with a "Minimum Advertised Price" ("MAP") policy. Under this arrangement, BTL mandates that providers, including Plaintiffs, may not advertise BTL treatments below a fixed price point—believed to be uniformly enforced across the U.S. market. These pricing controls are embedded directly in BTL's purchase agreements, automatically binding purchasers to the MAP terms upon acquisition of the equipment.

113. BTL's MAP policy applies to all BTL device purchasers, and is used to artificially control downstream retail pricing.

114. Under the MAP pricing system, purchasers are prohibited from

advertising or promoting treatment sessions below a specified amount—e.g., $850 per session. This was billed as an advantage to Plaintiffs because it would apply to any competitors offering the same treatments, and would ensure that revenues remained commensurate with their projections. However, in practice, Plaintiffs found that the MAP rules appeared to be selectively enforced, and many competitors were selling the same or similar treatments at a fraction of the cost that BTL set in the MAP guidelines. These limitations significantly impaired Plaintiffs' ability to offer competitive pricing in their local market and restrict lawful price-based competition.

115. In addition, continued operation of the devices is conditioned on the provider's purchase of costly proprietary consumables from BTL. Should a provider deviate from the MAP pricing—such as by advertising discounts—Defendant BTL enforces punitive measures, including doubling the cost of consumables, refusing to continue to supply consumables, and/or removing the provider from its online directory, which is marketed as essential for lead generation and patient visibility.

116. BTL also misleads purchasers into believing they can exit the MAP scheme without jeopardizing their financial investment.

117. Furthermore, the resale market for BTL devices is also highly regulated by BTL, further limiting Plaintiffs' ability to compete and maintain their businesses. For example, any attempt to resell a BTL device triggers an undisclosed "recertification" or "transfer" fee—often in the tens of thousands of dollars. While this fee is vaguely referenced in the purchase agreement, its actual amount is omitted, constituting a material omission and an unfair restraint on exit rights.

118. To further bind purchasers to its MAP pricing system, BTL maintains a continuing security interest in the devices, ensuring compliance with post-sale obligations and making resale or transfer of the devices exceedingly difficult. This mechanism effectively prevents buyers from recouping their investment, even when the devices fail to generate the promised return and undermines BTL's representations that it promotes a fair and open marketplace. Defendant BTL worked

hand-in-hand with private equipment financing companies to arrange for equipment financing agreements for its customers, including Plaintiffs, which were arranged with BTL-preferred equipment financing companies, including Defendants MMP, DEXT, NORTH MILL, and AMUR, without any input from the purchasers or disclosures to them, which included the payment of kickbacks to Defendant BTL by the financing companies.

119. BTL's North American headquarters is located in Marlborough, Massachusetts. BTL's CEO for North America, David Chmel, is also based in Massachusetts. Additionally, BTL's General Counsel, Director of Operations, Director of Product Management, Director of Digital Marketing and Technology, and Director of People and Culture are all based in Massachusetts. The fraudulent, misleading, and predatory sales tactics complained of herein were orchestrated by decision makers located in Massachusetts. The conspiracy between BTL and MMP alleged herein is also believed to have arose in Massachusetts. Based on BTL's provider directory, there are more than 150 providers of BTL devices located in Massachusetts, the majority of whom Plaintiffs believe are putative class members in this case, and who have been injured in Massachusetts as a result of BTL's fraudulent conduct.

120. At all times relevant to this Complaint, Defendant BTL has utilized Defendant MMP as its preferred financing partner for the purchase of BTL devices, with the vast majority of purchasers of BTL devices executing equipment financing agreements with MMP at the direction of Defendant BTL. Plaintiff Finnessy actually wanted to finance her purchase of the Emface device through her own bank but was told by both BTL representatives Tim Kerr and Brad Guthrie that BTL required that she finance the purchase through MMP.

121. However, unbeknownst to Plaintiffs and the members of the putative class, Defendant MMP was acting primarily as a broker for other equipment finance companies, and rather than retain its rights under the equipment financing

agreements, Defendant MMP would frequently assign its rights under the equipment financing agreements to Defendants DEXT, AMUR, and NORTH MILL, often doing so within a matter of days after the agreements were executed***, and without notice to the purchasers***.

122. Defendant MMP executed "broker agreements" with Defendants DEXT, AMUR, and NORTH MILL under which Defendant MMP would receive a broker fee for assigning the equipment financing agreements to the other Defendants. Examples of these broker agreements executed with Defendants DEXT and AMUR are attached hereto as **Exhibits C and D**.

123. Additionally, Plaintiffs have learned that Defendants MMP, DEXT, AMUR and NORTH MILL are in the business of converting the equipment financing agreements into "asset-backed securities" which they then bundle and sell to institutional investors. MMP has issued approximately $200 million in asset-backed securities, DEXT has issued in excess of $1 billion, and NORTH MILL and AMUR have each issued in excess of **$3 billion** in asset-backed securities, backed by equipment leases just like the ones at issue here. Plaintiffs believe that the financial incentives associated with brokering the financing agreements and selling the asset-backed securities creates an incentive for MMP, DEXT, NORTH MILL, and AMUR to prioritize high volume origination of equipment financing agreements while skirting underwriting guidelines, since they will profit from the sale of the securities and pass the risk of default on to their investors.

124. Upon information and belief, Mr. John-Paul Smolenski, the founder, president, and chief executive officer of Defendant MMP, frequently attended the sales conferences put on by BTL. Upon agreeing to purchase a BTL device, purchasers were frequently ushered to Mr. Smolenski who was prepared to execute an Equipment Financing Agreement, without performing any due diligence to ensure the purchasers were sufficiently credit-worthy.

125. All of Plaintiffs' financing documents were completed and submitted by

BTL employees on Plaintiffs' behalf. For example, in November 2024, BTL sales representative Tim Kerr visited Plaintiff Timmerman's office in Marysville, Washington to attempt to sell him BTL equipment. During the visit, Tim Kerr requested that Plaintiff Timmerman sign a release to allow BTL and MMP to obtain his credit score and credit history. MMP later approved Plaintiff Timmerman for financing based exclusively on information supplied by Tim Kerr and BTL.

126. Additionally, Plaintiffs believe that BTL has conspired with MMP and its other financing partners to use the credit scores and credit history of potential purchasers to charge higher device prices to purchasers that are more creditworthy. As set forth in Paragraph 78 herein, BTL charged Plaintiff Drab $372,000 for the Emsculpt Neo in September 2023, which was the same device that BTL sold to Plaintiff King in November 2021 for $197,000, a difference of $175,000. Similarly, BTL charged Plaintiff Kranitz $249,000 for the Emface in March 2023, which was the same device that BTL had just sold to Plaintiff King for $166,000 just five months earlier, in October 2022, a difference of $83,000. Given these wide variations in pricing for the same devices, combined with the fact that BTL was working with MMP to obtain Plaintiffs' credit information prior to quoting the prices, Plaintiffs believe that BTL and MMP are conspiring to charge higher prices to purchasers based on their ability to pay.

127. Unbeknownst to Plaintiffs, the MMP Equipment Financing Agreement BTL used, which was single spaced and printed in very fine print, included the following personal guarantee:

> "In consideration of Creditor entering into the EFA, the undersigned, together and separately, unconditionally, personally and irrevocably guarantee to Creditor the prompt payment and performance of all Debtor's obligations now and/or hereafter owes to Creditor. You agree that this is a guaranty of payment, not collection, and that Creditor can proceed directly against you without first proceeding against Debtor or the Collateral. You waive notice of acceptance, acceleration and

> default and all defenses, including protest, presentment and demand. Creditor may renew, extend or otherwise change the terms of the EFA without notice to you and you will be bound by such changes, and you will pay all of Creditor's costs of enforcement and collection, including reasonable attorneys' fees. This Guaranty is binding on your heirs, administrators, representatives, successors and assigns and survives the insolvency, bankruptcy or discharge from bankruptcy of Debtor."

128. This personal guarantee was not disclosed or explained to Plaintiffs. Each of the equipment financing agreements used by Defendants DEXT, NORTH MILL, and AMUR contain substantially similar language.

129. Defendants also misled Plaintiffs regarding the nature of the financing agreements, by verbally quoting inaccurate interest rates and assuring Plaintiffs that the loans could be cancelled, refinanced, or paid off early without penalty. Specifically, BTL sales representative Kristopher Huston told Plaintiff Drab that if the device wasn't working out for her, BTL would simply come and pick up the device, implying that it would be possible to exit the sale and financing agreements which was untrue.

130. Prior to executing the financing agreement for her Emface device in August 2024, Plaintiff Finnessy was told by Jack Miller, an Account Executive at MMP, that there was an early payoff option on the financing agreement, which Plaintiff Finnessy reasonably understood as meaning that she would not be charged unaccrued interest if she paid the principal balance off early. In an e-mail to Jack Miller dated December 7, 2024, Plaintiff Finnessy referenced this representation, stating "During our initial discussions, you explicitly assured me there were *no prepayment penalties*. Additionally, you helped calculate what you described as an effective interest rate of approximately 7.5% contingent on paying the balance over time. However, based on the figures you've now presented, I'm alarmed by the apparent discrepancy between what was discussed and the actual terms." In a

subsequent e-mail to Jack Miller on December 10, 2024 Plaintiff Finnessy reiterated, "We went over how it's like 7.5 percent and I asked if it would be no pre penalty pay out so I could save on the 7.5 percent over the 60 months You said yes." In reality, the actual annual percentage rate on Plaintiff Finnessy's Emface agreement was 18%, and MMP's financing agreements are structured as "sum of all payments" loans, meaning that the borrower is obligated to pay the full sum of all payments regardless of whether the debt is paid off early. Jack Miller responded to Plaintiff Finnessy by e-mail on December 10, 2024 and acknowledged "If I said there were early payoffs on each agreement, then I sincerely apologize as this was an error on my part." and "I apologize for the miscommunication."

131. Plaintiffs and other putative class members have also reported being verbally quoted a variety of inaccurate interest rates by BTL and MMP representatives. For example, on September 22, 2023, BTL representative Kris Huston verbally told Plaintiff Amy Drab that the interest rate for her Emsculpt Neo agreement was 14% but in fact the rate exceeded 14%. Other putative class members report being quoted interest rates in the single digits only to later learn that the actual annual percentage rate exceeded 15% or 20% in some cases.

132. The Equipment Financing Agreement used by MMP for Plaintiffs' transactions does not include required disclosures under the New York Commercial Finance Disclosure Law. The agreements do not contain and are not accompanied by any writings disclosing the total amount being financed, total and itemized finance charges, or true annual percentage rate, among other required disclosures. The financing agreements also do not qualify as "true leases" notwithstanding MMP's attempt to characterize them as leases, because they merely create a security interest in the collateral.

133. Defendant MMP also engaged in the practice of financing "split" transactions, which were used to increase the volume of equipment financing agreements being originated, increase broker fees, and skirt underwriting guidelines

by splitting one transaction into two smaller transactions and simultaneously assigning them to two different equipment financing companies.

134. For example, on September 20, 2022, Plaintiff Jennifer Tabiza Optometrist, APC signed two equipment financing agreements with MMP, for the Emface device and the Emsculpt Neo device, both of which carried an approximately $200,000 equipment price, not including financing charges. However, according to the UCC-1 forms filed with the California Secretary of State, MMP assigned the Emface contract to DEXT on September 26, 2022 and assigned the Emsculpt Neo contract to North Mill Credit Trust on September 29, 2022. Upon information and belief, this "split" transaction was facilitated by MMP in order to skirt underwriting guidelines, diffuse the risk of default, and increase the volume of financing agreements being originated and the related brokerage fees. The existence of this practice by MMP underlines the fact that MMP knew that BTL and MMP were inducing Plaintiffs and other similarly situated individuals and businesses to enter into financing arrangements that were likely to result in default.

135. In some instances, the second device is represented to the purchaser as a "free gift" when in reality MMP needed it in order to facilitate a prohibited "split" financing transaction. For example, BTL sales representative Kristopher Huston offered to include a free Cellutone device with Plaintiff Drab's purchase of the Emsculpt Neo in September 2023, which carried a total price of $372,000. However, the Cellutone device was actually being used as collateral to create a "split" transaction, whereby the price of the Emsculpt Neo was split between two financing agreements, one secured by the Emsculpt Neo for a principal of $213,440, and a second secured by the "free" Cellutone for a principal of $158,585.

136. Defendant MMP has actually admitted to facilitating these prohibited "split" transactions during a dispute with Defendant AMUR. Specifically, Defendant MMP's founder, President and CEO, John-Paul Smolenski, admitted in e-mails to Todd Wainwright, the Senior Vice President and Head of Commerce & Strategic

Partnerships for Defendant AMUR, that at least 28 different transactions constituted prohibited "split" transactions that violated the broker agreement between Defendant MMP and Defendant Amur, and were therefore subject to being repurchased by Defendant MMP. These transactions are currently the subject of a summary judgment motion filed by Defendant AMUR in a lawsuit currently pending in Nebraska state court, in Lancaster County, *Amur Equipment Finance, Inc. v. MMP Capital Inc.*, Case No. CI 25-220. A copy of the e-mail correspondence submitted in the summary judgment motion in the aforementioned matter is attached hereto as **Exhibit E**.

137. While Defendant AMUR maintains that it was unaware that it was purchasing "split" transactions from Defendant MMP, Defendant MMP counters that Defendant AMUR was well aware of Defendant MMP's practice of facilitating "split" transactions because in March of 2019, in connection with a contemplated acquisition of Defendant MMP by Defendant AMUR, Todd Wainwright and Defendant AMUR were given access to Defendant MMP's portfolio of equipment financing agreements to conduct due diligence, and that the portfolio included records that plainly revealed Defendant MMP's common practice of facilitating "split" transactions. Defendant MMP further alleges that there was a subsequent meeting between Smolenski and representatives of Defendant AMUR on April 10, 2019 to discuss the contemplated acquisition, during which Smolenski described Defendant MMP's business model to Wainwright and other representatives of Defendant AMUR, including Defendant MMP's frequent use of "split" transactions. *See* Defendant MMP Capital Inc.'s Brief In Support of Special Appearance and Motion to Dismiss, filed on April 8, 2025 in Lancaster County, Nebraska, Case No. CI 25-220.

138. Defendant NORTH MILL holds a minority ownership interest in MMP and has provided "growth capital" to MMP since 2022.

139. In the event that a borrower defaults on their financing agreement and Defendants seek to repossess the device, Defendants utilize a company called

"Aesthetic Laser City" which bills itself as "the fastest-growing provider of pre-owned, recertified aesthetic lasers in the United States." When Plaintiff Drab had her Emsculpt Neo device repossessed by NORTH MILL on July 14, 2026, it was picked up from Plaintiff Drab's medspa in Florida by a shipping company called "Total Quality Logistics." Plaintiff Drab inquired as to where the device was being taken, and was shown a copy of the bill of lading by Dylan Nedced, the Total Quality Logistics driver, which showed that the device was being delivered to "Aesthetic Laser City" with an address of 135 Maxess Road, Melville, NY 11747. *See* **Exhibit F**. However, this address is actually the listed address for MMP, leading Plaintiff Drab to believe that "Aesthetic Laser City" is actually just an alter ego of MMP. Plaintiff Drab was also told by Mr. Nedved that Total Quality Logistics has a longstanding account with NORTH MILL and that he transports between 2 to 15 repossessed devices per month to "Aesthetic Laser City" on behalf of NORTH MILL.

140. The financing arrangements are made without full disclosure to the purchasers of the risks and without adequately explaining that Defendant BTL's promised marketing support is either non-existent or ineffective. Instead, purchasers are left with significant debt obligations and minimal means to generate revenue to cover their costs. Defendant BTL's failure to disclose these material facts constitutes fraudulent concealment and deception.

141. Additionally, Defendants have aggressively enforced the equipment financing agreements against Plaintiffs and other similarly situated individuals and businesses, including Defendants DEXT and AMUR suing Plaintiff Nicole King for the full value of the equipment financing agreements, without any offsets, despite the fact that Plaintiff Nicole King voluntarily returned her BTL devices months ago. Plaintiffs believe that Defendants are in violation of Article 9 of the Uniform Commercial Code based on their failure to resell the collateral in a commercially reasonable manner and apply the sale proceeds to the debts.

## V. CLASS ACTION ALLEGATIONS

142. Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) on behalf of themselves and all other similarly situated individuals, defined as follows:

> **Nationwide Class:** All persons and entities in the United States who entered into sales agreements with BTL Industries, Inc. for the purchase of one or more aesthetic medical devices, including components of said devices, from the period of four years prior to the filing of this action to the present (the "Class Period").

> **Nationwide MMP Subclass:** All members of the Nationwide Class who entered into an equipment financing agreement with MMP Capital, Inc. for purchase of a BTL device during the Class Period.

143. In the alternative, Plaintiffs bring this action individually and on behalf of the following proposed State Classes of similarly situated persons defined as follows:

> **California Class:** All persons and entities in California who entered into sales agreements with BTL Industries, Inc. for the purchase of one or more aesthetic medical devices, including components of said devices, from the period of four years prior to the filing of this action to the present.

> **Florida Class:** All persons and entities in Florida who entered into sales agreements with BTL Industries, Inc. for the purchase of one or more aesthetic medical devices, including components of said devices, from the period of four years prior to the filing of this action to the present.

> **Washington Class:** All persons and entities in Washington who entered into sales agreements with BTL Industries, Inc. for the purchase of one or more aesthetic medical devices, including components of said devices, from the period of four years prior to the filing of this action to

the present.[4]

144. Excluded from the Class are Defendants, as well as their officers, directors, or employees; officers, directors, or employees of any entity in which Defendants currently have or has had a controlling interest; and Defendants' legal representatives, heirs, successors, and assigns.

145. Plaintiffs reserve the right to expand, limit, modify, or amend this class definition, including the addition of one or more subclasses, in connection with their motion for class certification, or at any other time, based upon, among other things, changing circumstances and/or new facts obtained during discovery.

146. The Class members are so numerous that joinder of all members is impracticable. Plaintiffs are informed and believe that the proposed Class contains hundreds of individuals and/or businesses who have been damaged by Defendants' conduct as alleged herein. Based on information contained within BTL's online provider directory, BTL identifies more than 6,100 providers of BTL devices in the United States.

147. Each member of the proposed Class herein has been exposed to and relied upon Defendant BTL's false and/or misleading sales and marketing tactics. The sales of each device by Defendant BTL to Class Members throughout the Class Period has resulted from Defendant BTL's sales representatives and marketing materials falsely promising that purchases of Defendant BTL's devices would include sales leads and marketing support to increase treatment sales. Defendant BTL's deceptive practices also included imposing price-fixing requirements, which prevented Class Members from competitively selling treatments to generate revenue to pay off high interest financing agreements entered into based on Defendant BTL's misrepresentations. Each Class Member was deceived and induced into entering equipment financing agreements with the financer for their purchase transaction,

[4] The members of the various classes defined herein are collectively referred to as the "Class".

including Defendants MMP, DEXT, NORTH MILL, and AMUR with no disclosure to them of the financers' relationship to BTL and no knowledge that the financing approval was made possible through Defendants' fraud.

148. Common questions of law and/or fact exist in this case with respect to the proposed Class, which predominate over any questions affecting individual members of the Class. The common questions of law and/or fact include, but are not limited to, the following:

(a) Whether, during the Class Period, Defendant BTL used false representations and/or falsely advertised marketing and sales generation support to induce Class Members into purchasing equipment;

(b) Whether the Class Members' contracts are vitiated by Defendants' fraudulent conduct;

(c) Whether Defendants intentionally misrepresented and/or omitted material facts to Class Members to induce Class Members to purchase one or more device(s);

(d) Whether the Class Members relied on these misrepresentations and omissions;

(e) Whether Defendants negligently provided false information to the Class Members;

(f) Whether Class Members have suffered financial losses due to Defendants' misrepresentation;

(g) Whether, during the Class Period, Defendant BTL engaged in monopolistic practices by controlling the market for medical and aesthetic equipment;

(h) Whether Defendant BTL's actions violate California's antitrust laws, including without limitation the Cartwright Act;

(i) Whether Defendants assumed a fiduciary duty by controlling the financing process for Class Members;

(j) Whether Defendants breached their fiduciary duties by prioritizing their interests over those of the Class Members;

(k) Whether Defendants breached the terms of the equipment/device(s) sales contracts with the Class Members;

(l) Whether a failure of consideration entitles Class Members to rescind the contracts;

(m) Whether Defendant BTL's use of the misleading, false and deceptive sales and marketing scheme described herein constituted false advertising under California law;

(n) Whether Defendants engaged in unfair, unlawful, and/or fraudulent business practices under California law;

(o) Whether Plaintiffs and Class members are entitled to damages and/or restitution and the proper measure of such losses;

(p) Whether Defendant BTL continues to use false, misleading, and/or illegal price fixing such that an injunction is necessary.

(q) Whether Plaintiffs and Class members will suffer irreparable harm should they be required to continue making payments under the terms of the equipment financing agreements.

149. Plaintiffs' claims are typical of the claims of the Class Members because Plaintiffs, like all Class Members, were deceived by Defendants' false statements regarding the volume of treatments being sold at full price by other providers, promised marketing and sales support and post-purchase price fixing, and were subject to Defendants' equipment financing agreements, as alleged herein, in a typical consumer setting and sustained damages from Defendants' wrongful conduct.

150. Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in litigating complex class actions. Plaintiffs have no interests that conflict with those of the Class.

151. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

152. The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met, as Defendants have acted or refused to act on grounds that apply generally to the Class so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole.

153. Defendants' conduct is generally applicable to the Class as a whole and Plaintiffs seek, *inter alia*, equitable remedies with respect to the Class as a whole. As such, Defendants' systematic practices make declaratory relief with respect to the Class as a whole appropriate.

154. The requirements of Fed. R. Civ. P. 23(b)(3) are met as common issues predominate over any individual issues, and treatment of this matter as a class action is superior to numerous individual actions.

155. The litigation of separate actions by Class Members would create a substantial risk of inconsistent of varying verdicts or adjudications with respect to the individual Class Members against Defendants herein; and which would establish potentially incompatible standards of conduct for Defendants; and/or legal determinations with respect to individual Class Members which would, as a practical matter, be dispositive of the interests of the other Class Members not parties to adjudications or which would substantially impair or impede the ability of the Class Members to protect their interests.

# VI. CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Breach of Fiduciary Duty

*(Against All Defendants)*

156. BTL voluntarily sent Plaintiffs' applications to specific lenders, MMP, DEXT, NORTH MILL, and AMUR thus taking control of the purchase financing and inducing Plaintiffs to enter into onerous and unconscionable contractual terms. This voluntary act placed BTL and the financing Defendants, in a fiduciary relationship with Plaintiffs, acting as the more qualified and experienced contracting entities, advising Plaintiffs on financing, submitting their applications to hand-picked lenders BTL chose, with high interest rates and strict terms, all the while Plaintiffs believed that BTL and the financing Defendants were helping them through the process.

157. As fiduciaries, Defendants were legally bound to put the buyer's best interests ahead of their own by knowingly accepting a duty on behalf of another. Defendants were required, as fiduciaries, to act as prudent persons in the buyer's best interest but did not.

158. Acting for both the buyer and the seller, BTL and the financing Defendants created a conflict of interest, arranging loans for the buyer, using expertise in conducting loan closings, benefiting BTL with significant sales that it knew or should have known would ultimately harm a buyer, thereby breaching the fiduciary duty to Plaintiffs and the putative Class Members, causing them damage.

159. The loan contracts at issue were contracts of adhesion, drafted in favor of the lenders and seller, with a company that had a monopoly on the products, and contained non-negotiable terms. For example, one such Equipment Financing Agreement contains a clause stating:

> Creditor may renew, extend or otherwise change the terms of the EFA without notice to you and you will be bound by such changes, and you will pay all of Creditor's costs of enforcement and collection, including [reasonable] attorneys' fees. This Guaranty is binding on your heirs,

administrators, representatives, successors and/or assigns and survives the insolvency, bankruptcy or discharge from bankruptcy of the Debtor.

160. Additional provisions within the contract, undisclosed to Plaintiffs, included a requirement that the buyer MUST charge BTL's suggested retail price for services/treatments on the purchased equipment or the equipment warranty would be terminated. Thus, BTL engaged in price fixing, controlling the price the buyer could charge for services in using the equipment.

161. Due to the above, Defendants, their employees, agents, and assigns, breached their fiduciary duties owed to Plaintiffs.

## SECOND CAUSE OF ACTION

### Fraud and Fraudulent Deceit

*(Against Defendants BTL and MMP)*

162. Plaintiffs repeat and reallege each of the foregoing allegations, as though fully set forth herein.

163. This cause of action is brought against BTL and MMP based on the common laws of Massachusetts and New York, as well as the common laws of the states in which Plaintiffs and the Class Members transacted with BTL and MMP.

164. BTL and MMP, including their employees, agents, and assigns, engaged in fraudulent conduct by:

a) Misrepresenting the number of treatments being sold by other providers of BTL devices;

b) Misrepresenting treatments that had been given away for free as having been sold at full price;

c) Misrepresenting the number of other devices that had already been sold in a prospective buyer's geographic market;

d) Misrepresenting the amount of revenue and profits that were being generated by other providers of BTL devices;

e) Misrepresenting the requirement that the devices be operated only by a licensed physician or under the supervision of a medical director;

f) Misrepresenting the amount of marketing support that would be provided by BTL post-purchase;

g) Misrepresenting the effective interest rates on equipment financing agreements;

h) Misrepresenting the binding nature of the equipment financing agreements and suggesting that they can be exited without penalty;

i) Misrepresenting the ability of the borrowers to pay the debts off early;

j) Fraudulently altering financial documents in order to obtain approval for high loan amounts, including falsifying credit reports;

k) Issuing loans based on non-existent and/or falsified valuations of loan collateral;

l) Concealing advertising rebates as illusory collateral to secure loans;

m) Falsely representing that purchasers were required to seek financing of BTL devices through MMP;

n) Making ancillary agreements and promises as incentives to purchase devices, which were subsequently not honored;

o) Facilitating "split" transactions in order to qualify purchasers for excessive amounts of debt obligations;

p) Artificially inflating the amount to be financed in order to pay kickbacks to BTL sales representatives in exchange for funneling purchasers to MMP.

165. Defendants BTL's and MMP's fraudulent statements were made with knowledge of their falsity.

166. Defendants BTL and MMP made these fraudulent statements and representations with the intent to obtain an unjust advantage by inducing Plaintiffs and Class Members to purchase devices and enter into high-interest financing

agreements under false pretenses.

167. Plaintiffs and Class Members justifiably relied on Defendants BTL and MMP's misrepresentations and omissions in deciding to purchase the devices and enter into financing agreements. Had Plaintiffs and Class Members been informed of the true nature of the financing arrangements and the realistic potential for revenue generation from purchasing the devices, they would not have entered into the agreements.

168. As a result of Defendants BTL and MMP's fraudulent conduct, Plaintiffs and the Class Members have suffered substantial financial harm, both paying out of pocket on high interest loans, experiencing unrealized business opportunities, entering bankruptcy, and will continue to suffer harm. By the same token, as a result of these same practices, Defendants have unfairly reaped substantial gains in sky-rocketing device sales and continued growth in the market they monopolize.

## THIRD CAUSE OF ACTION

### Fraudulent Concealment or Omission

*(Against All Defendants)*

169. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

170. This cause of action is brought against Defendants based on the common laws of Massachusetts and New York, as well as the common laws of the states in which Plaintiffs and the Class Members transacted with Defendants.

171. Defendants, acting through their sales representatives, agents, loan officers, and marketing channels, knowingly and willfully concealed or omitted material facts regarding the actual value of the devices, the revenue potential of BTL's devices, the FDA licensing requirements, the ability to exit the contracts or pay off the devices early, the number of competing clinics in specific geographic areas and their economic distress, and the availability of promised marketing and

advertising support.

172. Rather than disclose the truth about the devices' value, profitability, availability of marketing support, and the nature of the financing contracts, Defendants actively promoted the devices with false representations to induce Plaintiffs and the Class to purchase more devices and enter into high-interest financing agreements.

173. Defendants' concealment and omissions were material because they directly impacted Plaintiffs' and the Class Members' decisions to purchase the devices and commit to financing agreements based on false promises.

174. Defendants knew or should have known that their representations about the products were false in that Defendants knew that other purchasers were experiencing financial distress as a result of entering into exorbitant financing contracts for devices with low customer demand and no ability to lower prices that in many instances required the hiring of a medical director, and that financing contracts were being defaulted on at a high rate. Defendants also knew that they were colluding with one another to generate financing agreements to bundle and sell as asset-backed securities, often by splitting loans into two parts by assigning fraudulent value to "free" collateral. Defendants also knew that there was no way to exit the financing contracts or pay them off early. Yet Defendants never disclosed any of these material facts to Plaintiffs and the Class Members.

175. Defendants MMP, DEXT, NORTH MILL, and AMUR knew or should have known that BTL was supplying them with falsified or otherwise grossly inaccurate data and financial documents in order to secure loans for Plaintiffs and the Class Members. Defendants MMP, DEXT, NORTH MILL, and AMUR also knew or should have known that the terms of these loans were materially misrepresented to Plaintiffs at the time they were signed.

176. Plaintiffs and the Class reasonably relied on Defendants' partial representations and omissions, believing that the devices would generate sufficient

revenue through marketing support and advertising leads as promised by Defendant so as to render the purchases sound business decisions.

177. As a direct and proximate result of Defendants' fraudulent concealment and omissions, Plaintiffs and the putative Class have suffered substantial damages, including financial losses due to their inability to generate revenue sufficient to satisfy the high-interest financing agreements.

178. Defendants' conduct was malicious, oppressive, and carried out with willful and reckless disregard for the rights and financial well-being of Plaintiffs and the Class.

179. Plaintiffs and the Class are entitled to compensatory damages, punitive damages, attorneys' fees, costs, and all other relief the Court deems proper.

**FOURTH CAUSE OF ACTION**

**Violation of California's Antitrust Law**

**California Business & Professions Code §§ 16700 – 16770**

*(Against Defendant BTL)*

180. Plaintiffs repeat and reallege each of the foregoing allegations, as though fully set forth herein.

181. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 - 16770, prohibits agreements, combinations, or conspiracies to restrain trade or engage in unfair methods of competition.

182. BTL has engaged in unlawful restraints of trade through its conduct, including, but not limited to:

a) BTL possesses monopoly power as the sole patentee and exclusive distributor in a clearly defined economic and geographic market and proved its intent to maintain that power with lawsuits against companies attempting to sell like equipment in the United States.

b) BTL manipulated financial contracts and resources of customers unrelated to the patent, in order to obtain an advantage that was not just being the sole vendor of the product.

c) BTL asserted significant pressure on purchasers during sales pitches, ran credit reports without consent, and obtained loan approval all within a single sales pitch, thereby asserting undue influence over the terms of the agreement and inducing Class Members to assent to the one-sided terms.

d) BTL controls the product prices and/or excludes competition in the United States market. By requiring purchasers of its devices to adhere to minimum pricing agreements, BTL thereby prevents Class Members from selling treatments at competitive prices.

e) BTL utilized deceptive advertising practices to induce Class Members to enter high-interest financing agreements, while simultaneously imposing price-fixing requirements that restricted their ability to profit from the use of Defendant BTL's devices.

f) Engaging in coercive marketing practices designed to prevent fair competition in the marketplace for aesthetic medical devices.

g) BTL used its power as sole producer of the Emsculpt line of devices to threaten Plaintiffs and Class Members with being cut-off from future purchases of consumable products necessary to the function of the devices, such as auxiliary "paddles" and applicators used to administer treatments.

h) Defendant BTL's conduct constitutes a conspiracy or agreement that unreasonably restrains trade and undermines free competition in violation of the Cartwright Act.

183. Plaintiffs detrimentally relied upon BTL, its employees, agents, and assigns, and its selected lenders when BTL induced them to purchase equipment that it knew Plaintiffs would be unable to pay for, and the chosen lenders provided the

loans. Plaintiffs paid duplicative fees and charges to multiple lenders and signed contracts of adhesion, causing irreparable damage to Plaintiffs.

184. BTL claimed Plaintiffs would obtain thousands of dollars in sales, completed their loan applications, which made them privy to their lack of financial ability to obtain loans in the amounts necessary to purchase BTL products and therefore knew they could not repay the loans. Plaintiffs were induced to sign financial contracts that BTL knew were beyond Plaintiffs' legal understanding ability to pay, which caused Plaintiffs substantial harm and damages. Specifically, all Plaintiffs have been subject to monthly payments toward the devices in the range of three to ten thousand dollars, inability to sell treatments at a profit because of BTL's artificial price fixing that is out of sync with the market, and emotional and financial distress due to notices sent by Defendants threatening legal action for selling treatments below MAP pricing and failing to fully pay loan obligations.

185. As a result of Defendant BTL's fraudulent conduct, Plaintiffs and the Class Members have suffered substantial financial harm, both paying out of pocket on high interest loans and experiencing unrealized business opportunities and will continue to suffer harm.

## FIFTH CAUSE OF ACTION

### Fraudulent/Intentional Misrepresentation

*(Against Defendant BTL)*

186. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

187. Plaintiffs bring this claim individually and on behalf of the Class under California law.

188. Defendant BTL falsely represented to Plaintiffs and the Class that they would receive a dramatic increase in revenue and promised sales and advertising support by purchasing its products to use to conduct treatments on their clients.

189. Defendants intentionally, knowingly, and recklessly made these

misrepresentations to induce Plaintiffs and the Class to purchase the Products.

190. Plaintiffs did in fact rely on these misrepresentations and purchased the products to their detriment. Given the deceptive manner in which Defendants advertised, marketed, represented and otherwise promoted the Products, Plaintiffs' and the Class's reliance on Defendants misrepresentations was justifiable.

191. As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class have suffered actual damages in that they have purchased products by entering high interest financing agreements in the hundreds of thousands of dollars and are unable to use the products due to enforced non-competitive pricing.

192. Plaintiffs and the Class seek actual damages, attorney's fees, costs, and other such relief the Court deems proper.

## SIXTH CAUSE OF ACTION

### Negligent Misrepresentation

*(Against Defendants BTL and MMP)*

193. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

194. This cause of action is brought against BTL and MMP based on the common laws of Massachusetts and New York, as well as the common laws of the states in which Plaintiffs and the Class Members transacted with BTL and MMP.

195. Defendants BTL and MMP owed duties to Plaintiffs and the Class to exercise reasonable care in, marketing, advertising, selling, providing information regarding the devices, including revenue potential, marketing support, profitability of the devices, and procuring loans that Plaintiffs and the Class were financially qualified to receive.

196. Defendants BTL and MMP breached their duties to Plaintiffs and the Class by negligently providing false and misleading information including misrepresentations about the revenue potential of Defendant BTL's products; false promises of marketing support, advertising materials, and sales referrals that were

never provided; false representations regarding the terms of their financing agreements, and inducing the Plaintiffs and the Class to enter high-interest agreements under misleading pretenses.

197. Defendants BTL and MMP knew or should have known that the representations made were false, inaccurate, or misleading, and that Plaintiffs and the Class would reasonably rely on such representations when purchasing the products and signing finance agreements.

198. As a direct and proximate result of Defendant BTL's and MMP's negligent misrepresentations, Plaintiffs and the Class have suffered actual damages including financial losses resulting from their inability to generate revenue sufficient to satisfy the high-interest finance agreements.

199. Plaintiffs and the Class seek actual damages, attorney's fees, costs, and any other such relief the Court deems proper.

200.

## <u>SEVENTH CAUSE OF ACTION</u>

### Violation of California's Unfair Competition Law ("UCL")

### California Business and Professions Code § 17200, *et seq.*

*(Against All Defendants)*

201. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

202. Defendants' conduct described herein violates each of the three prongs of the Unfair Competition Law (the "UCL"), codified at California Business and Professions Code § 17200, *et seq.*, as it constitutes unlawful, unfair, and fraudulent conduct under each of the statute's three independent liability theories.

203. The UCL prohibits, and provides civil remedies for, "unfair competition". Its purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping

language.

204. By defining unfair competition to include "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws to be treated as unfair competition that is independently actionable and sweeps within its scope acts and practices not specifically proscribed by any other law.

205. The UCL imposes strict liability. Plaintiffs need not prove that Defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

***"Unfair Prong"***

206. A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications, and motives of the practice against the gravity of the harm to the alleged victims.

207. Defendants committed unfair business practices in violation of the UCL in the following respects, among others:

a) Defendant BTL engaged in misleading and deceptive sales tactics that represented unrealistic revenue potential and failed to deliver the promised post-purchase support including advertising and sales referrals.

b) Defendant BTL's sales representatives promoted the purchase of BTL's devices by suggesting that such purchases would lead to a dramatic increase in revenue streams. These unrealistic projections resulted in Plaintiffs swiftly amassing large amounts of debt and entering financing agreements that were impossible to break.

c) Defendant BTL imposed price fixing requirements on Plaintiffs, preventing them from offering treatments at competitive prices.

Defendants' practices were immoral, unethical, oppressive, and substantially injurious to consumers.

d) Defendants MMP, DEXT, NORTH MILL, and AMUR knew or should have known that BTL was supplying Plaintiffs with falsified or otherwise grossly inaccurate data and financial documents in order to secure loans for Plaintiffs and the Class Members.

e) Defendants MMP, DEXT, NORTH MILL, and AMUR also knew or should have known that the terms of these loans were materially misrepresented to Plaintiffs at the time they were signed

208. The harm to Plaintiffs and Class Members outweighs the utility of Defendants' practices. There were reasonably available alternatives to further Defendants' legitimate business interests other than the misleading and deceptive conduct described herein.

***"Fraudulent" Prong***

209. A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

210. Defendants' acts and practices alleged above constitute fraudulent business acts or practices as they have deceived Plaintiffs and are highly likely to deceive members of the consuming public. Plaintiffs relied on Defendants' fraudulent and deceptive representations through the sales representatives, website, sales conferences, verbal commitments, and presentation of loan documents.

211. Such representations included unrealistic earnings potential based upon inflated or completely false sales data, unfulfilled promises of sales generation, promised advertising and marketing support for products which Defendant BTL sells which were never provided, and enforcement of loan terms known to be unlawful under California law. These misrepresentations played a substantial role in Plaintiffs' decision to purchase those products often resulting in the purchase of multiple devices at once.

212. Plaintiffs would not have purchased those products without Defendants' misrepresentations.

***"Unlawful" Prong***

213. A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

214. Defendants' deceptive business practices violated numerous other laws, such as statutory laws, Cal. Bus. & Prof. Code § 17500 and common law principles related to fraud, contract law, and unfair competition, as set forth herein.

215. As a result of BTL's violations of the FAL, and other laws, Plaintiffs and the Class Members have each lost substantial sums of revenue and are paying out of pocket on high interest loans and will continue to suffer harm. By the same token, as a result of these same practices, BTL has unfairly reaped substantial gains in sky-rocketing device sales and continued growth in the market they monopolize fueled by unlawful misrepresentations.

216. As a result of Defendants MMP, DEXT, NORTH MILL, and AMUR's various violations of California law, as alleged in all previous paragraphs, Plaintiffs and the Class Members have each been subject to unlawful and high-interest loan agreements, lost substantial sums of revenue and will continue to suffer harm. By the same token, as a result of these same practices, Defendants MMP, DEXT, NORTH MILL, and AMUR have unfairly reaped substantial gains through servicing loans knowingly obtained through unlawful means.

217. Defendants' practices, as set forth above, have misled Plaintiffs, and the proposed Class, in the past and will continue to mislead in the future. Consequently, Defendants' practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

218. Pursuant to the UCL, Plaintiffs and the Class are entitled to disgorgement and restitution of all of Defendants' revenues associated with their unfair competition, or such portion of those revenues as the Court may find equitable.

219. Because Defendants continue to deceive current and prospective customers, public injunctive relief under the UCL is also necessary.

**EIGHTH CAUSE OF ACTION**

**Violation of California's False Advertising Law ("FAL")**

**California Business & Professions Code § 17500, *et seq.***

*(Against Defendant BTL)*

220. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

221. Defendant BTL's conduct described herein violates California's False Advertising Law (the "FAL"), codified at California Business and Professions Code section 17200, et seq.

222. The FAL provides in pertinent part, that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof . . . to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning . . . those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell . . . those services, professional or otherwise, so advertised at the price stated therein, or as so advertised…"

223. Like the UCL, the FAL expressly provides for injunctive relief, and also

contains provisions denoting its public purpose. A claim for injunctive relief under the FAL is brought by Plaintiffs acting in the capacity of a private attorney general. Although the private litigant controls the litigation of an FAL claim, the private litigant is not entitled to recover compensatory damages for his own benefit, but only disgorgement of profits made by the Defendants through untrue or misleading advertising in violation of the statutory scheme or restitution to victims of the untrue or misleading advertising.

224. Defendants engaged in untrue and/or misleading advertising practices in violation of the FAL in the following respects, among others:

a) Defendant BTL engaged in misleading and deceptive sales tactics that represented unrealistic revenue potential and failed to deliver the promised post-purchase support including advertising and sales referrals.

b) Defendant BTL's sales representatives promoted the purchase of BTL's devices by suggesting that such purchases would lead to a "dramatic increase in revenue streams". These unrealistic projections resulted in Plaintiffs swiftly amassing large amounts of debt and entering financing agreements that were impossible to break.

c) Defendant BTL imposed price fixing requirements on Plaintiffs, preventing them from offering treatments at a competitive price. Defendants practices were immoral, unethical, oppressive, and substantially injurious to consumers.

225. BTL disseminated these misleading statements through various channels, including sales representatives, promotional materials, sales conferences, and marketing campaigns.

226. The harm to Plaintiffs and the Class Members arising from BTL's untrue and/or misleading advertising practices relating to the earning potential and BTL's advertising, sales, and marketing support to be included in the purchase of its devices

outweighs the utility, if any, of those practices.

227. Plaintiffs and Class Members relied on BTL's misrepresentations when deciding to purchase BTL's devices over its competitors and how many devices to purchase, entering into high-interest financing agreements for hundreds of thousands of dollars. No rational person would assume this level of debt at high interest rates absent BTL's wrongful conduct.

228. BTL's untrue and/or misleading advertising practices relating to the earning potential and BTL's advertising, sales, and marketing support to be included in the purchase of its devices as alleged herein are immoral, unethical, oppressive, unscrupulous, unconscionable, and/ or substantially injurious to Plaintiffs and the Class Members.

229. As a result of Defendants' violations of the FAL, Plaintiffs and the Class Members have each lost substantial sums of revenue and are paying out of pocket on high interest loans and will continue to suffer harm. By the same token, as a result of these same practices, Defendant BTL has unfairly reaped substantial gains with sky-rocketing BTL device sales and substantial growth in the market they monopolize.

230. Because Defendant BTL continues to deceive current and prospective customers, public injunctive relief under the FAL is also necessary.

## NINTH CAUSE OF ACTION

### Monopoly in Violation of California Law

*(Against Defendant BTL)*

231. Plaintiffs repeat and reallege each of the foregoing allegations, as though fully set forth herein.

232. BTL has willfully acquired and maintained monopoly power in the market for non-invasive body-contouring and aesthetic medical devices in violation of California's Cartwright Act (Bus. & Prof. Code §§ 16700–16770), as well as California common law.

233. BTL holds the sole patent rights to its Emface and Emsculpt series

devices and uses this market dominance to eliminate or severely restrict competition by: (a) blocking the importation of competing devices; (b) enforcing RPM and MAP agreements that suppress price competition among providers; and (c) leveraging its sales and financing structures to prevent small business purchasers from seeking alternative vendors.

234. BTL further entrenches its monopoly by requiring providers to purchase proprietary consumables and enforcing punitive penalties for non-compliance, effectively eliminating aftermarket competition.

235. BTL's monopoly conduct is not merely based on the patent itself, but on its use of the patent as a lever to extend control over downstream pricing, financing, and resale markets, thereby harming both competition and consumers.

236. Plaintiffs and Class Members, direct purchasers, and users of BTL's devices, have suffered financial harm because of BTL's monopolistic practices, including inflated prices, foreclosure of alternative products, and anti-competitive contractual constraints.

237. BTL's conduct constitutes unlawful monopolization under the Cartwright Act and California common law. Plaintiffs and Class Members seek treble damages pursuant to Cal. Bus. & Prof. Code § 16750(a), injunctive relief, attorneys' fees, and any other relief deemed appropriate by the Court.

## **TENTH CAUSE OF ACTION**

### **Recission**

### **California Civil Code § 1689**

*(Against All Defendants)*

238. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

239. BTL, through its sales representatives, made false representations to Plaintiffs and Class Members, including that they would not be competing with any other BTL devices in their geographic vicinity, that other competitors would not be

able to undercut them on pricing, and that they could expect revenues from the BTL devices to significantly outpace their cost.

240. These projections were made without basis and were known by BTL to be false.

241. BTL also falsely stated that Plaintiffs and Class Members would receive valuable post-purchase support, and that BTL would actively refer clients to their Medspas.

242. Plaintiffs and Class Members relied on these representations and were induced to sign purchase contracts totaling in the hundreds of thousands of dollars, believing they would receive support and income sufficient to justify the investment.

243. BTL's misrepresentations were intentional, reckless, and made with the purpose of inducing Plaintiffs' and Class Members' reliance. As a direct result, Plaintiffs and Class Members suffered damages including financial distress, unpaid debt, credit harm, and lost business.

244. Plaintiffs and Class Members seek recission of the alleged contracts in addition to compensatory and punitive damages, attorneys' fees, and any further relief deemed proper by the Court.

## <u>ELEVENTH CAUSE OF ACTION</u>

**Violation of the Robinson-Patman Act**

**15 U.S.C. § 13**

*(Against Defendant BTL)*

245. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

246. The Robinson-Patman Act, 15 U.S.C. § 13, prohibits price discrimination in the sale of commodities of like grade and quality where the effect of such discrimination may be to substantially lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition.

247. At all relevant times, BTL's aesthetic medical devices, including the

Emsculpt Neo, Emsculpt Classic, Emface, Emsella, Emtone, Exomind, and Exion, constituted "commodities" within the meaning of the Robinson-Patman Act, and each sale of such devices occurred in interstate commerce.

248. Defendant BTL made contemporaneous sales of its devices, which are commodities of like grade and quality, to different purchasers at different effective prices, thereby creating discriminatory pricing in violation of 15 U.S.C. §§ 13(d) and 13(e).

249. BTL's discriminatory conduct had the effect of substantially lessening competition among purchasers of BTL devices, and/or tending to create a monopoly in the market for non-invasive aesthetic medical device treatments, and/or injuring, destroying, or preventing competition with Plaintiffs and Class Members who were disfavored by BTL's pricing and promotional practices.

250. As a direct and proximate result of BTL's violations of the Robinson-Patman Act, Plaintiffs and Class Members have suffered actual competitive injury, including lost sales, diminished revenue, inability to compete effectively in their local markets, and financial losses.

251. Plaintiffs and the Class seek treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, injunctive relief, attorneys' fees, costs, and any other relief the Court deems proper.

## TWELFTH CAUSE OF ACTION

### Civil Conspiracy to Violate the Robinson-Patman Act

*(Against Defendants BTL and MMP)*

252. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

253. Beginning at a time unknown to Plaintiffs but no later than November 2021, Defendants BTL and MMP entered into an agreement, combination, or conspiracy to engage in price discrimination in the sale of BTL's aesthetic medical devices in violation of the Robinson-Patman Act, 15 U.S.C. § 13.

254. The object of the conspiracy was to engage in unlawful price discrimination by charging discriminatorily high prices to certain purchasers who were evaluated to be more credit-worthy while offering significantly lower prices to other purchasers who were not deemed to be as credit-worthy, thereby restraining competition in violation of 15 U.S.C. § 13.

255. In furtherance of the conspiracy, Defendants committed overt acts including, but not limited to: MMP obtaining the credit history of Plaintiffs and putative class members and sharing this information with BTL for the purpose of identifying purchasers who could be charged higher prices for BTL devices; BTL obtaining credit history of Plaintiffs and putative class members prior to issuing any price quotes, and then quoting higher prices to prospective purchasers with stronger credit.

256. Defendants BTL and MMP knowingly and intentionally participated in the conspiracy with knowledge that the scheme's objective was to discriminate among purchasers of BTL devices in violation of the Robinson-Patman Act, and Defendants BTL and MMP intended to further the conspiracy's unlawful purpose.

257. As a direct and proximate result of Defendants BTL's and MMP's conspiracy, Plaintiffs and Class Members have suffered actual injury including lost revenue, inability to compete in their local markets, and substantial financial losses from debt obligations incurred as a result of Defendants' coordinated scheme.

258. Plaintiffs and the Class seek treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, injunctive relief, attorneys' fees, costs, and any other relief the Court deems proper.

## **THIRTEENTH CAUSE OF ACTION**

**Unfair or Deceptive Business Practices**

**Mass. Gen. Laws ch. 93A, § 11**

*(Against Defendant BTL)*

259. Plaintiffs repeat and re-allege the allegations contained in every

preceding paragraph as if fully set forth herein.

260. Massachusetts General Laws chapter 93A, Section 11, prohibits any person engaged in trade or commerce from engaging in unfair or deceptive acts or practices in the conduct of any trade or commerce.

261. At all relevant times, BTL was engaged in trade or commerce within the meaning of Mass. Gen. Laws ch. 93A.

262. BTL committed unfair and/or deceptive acts or practices in the conduct of trade or commerce by, among other things: making false and misleading representations regarding the revenue being generated by other providers on BTL's devices; promising marketing support, advertising materials, and sales referrals that were never provided; imposing price-fixing requirements through MAP policies while selectively enforcing such policies; facilitating prohibited "split" financing transactions; falsifying or inflating financial documents to secure loan approvals; and concealing material terms of financing agreements from Plaintiffs and Class Members.

263. Defendant BTLs' conduct was orchestrated from its headquarters in Massachusetts and impacted numerous members of the Class located in Massachusetts.

264. Defendant BTL's conduct was unfair because it offended established public policy, was immoral, unethical, oppressive, and unscrupulous, and caused substantial injury to Plaintiffs and Class Members. Defendant BTL's conduct was deceptive because it had the capacity to mislead reasonable persons in Plaintiffs' position, and did in fact mislead Plaintiffs and Class Members into purchasing devices and entering high-interest financing agreements they would not have otherwise entered.

265. As a direct and proximate result of Defendant BTL's unfair and deceptive acts and practices, Plaintiffs and Class Members suffered a loss of money or property, including payments made under high-interest financing agreements, lost

business revenue, and other consequential financial harm.

266. Defendant BTL's unfair and deceptive conduct was willful and knowing, entitling Plaintiffs and Class Members to treble damages pursuant to Mass. Gen. Laws ch. 93A, § 11.

267. Plaintiffs and the Class seek treble damages, attorneys' fees, costs, and any other relief the Court deems proper pursuant to Mass. Gen. Laws ch. 93A, § 11.

## FOURTEENTH CAUSE OF ACTION

### Deceptive Acts and Practices

### N.Y. Gen. Bus. Law § 349

*(Against Defendants MMP, DEXT, NORTH MILL and AMUR)*

268. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

269. New York General Business Law Section 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

270. Defendants MMP, DEXT, NORTH MILL, and AMUR engaged in consumer-oriented conduct that had a broad impact on consumers at large. Defendants' conduct was not a private contractual dispute but rather a standardized scheme of inducing numerous small-business purchasers of BTL devices throughout the State of New York and nationwide to enter into predatory financing contracts.

271. Defendants' conduct was materially misleading and deceptive within the meaning of Section 349. Specifically, the financing Defendants, as "providers" of commercial financing or their assignees, within the meaning of the New York Commercial Finance Disclosure Law, N.Y. Fin. Serv. Law §§ 801–812, failed to provide Plaintiffs and Class Members with the disclosures mandated by that statute, including but not limited to: the total amount of financing; the finance charge; the annual percentage rate; the total repayment amount; prepayment policies and penalties; and a description of collateral requirements.

272. Defendants' failure to provide the disclosures required by the New York Commercial Finance Disclosure Law constituted a deceptive act or practice within the meaning of N.Y. Gen. Bus. Law § 349, as such nondisclosures were material and likely to mislead a reasonable consumer acting reasonably under the circumstances.

273. As a direct result of Defendants' deceptive acts and practices, Plaintiffs and Class Members suffered actual injury, including economic damages from being forced to make payments pursuant to financing agreements whose true terms were not disclosed, default and foreclosure as a result of not understanding the terms of the financing agreements, loss of businesses, and personal bankruptcies, and other consequential financial harm.

274. Defendants' deceptive acts and practices were willful and knowing, entitling Plaintiffs and Class Members to treble damages up to one thousand dollars ($1,000) per violation, or actual damages, whichever is greater, pursuant to N.Y. Gen. Bus. Law § 349(h).

275. Plaintiffs and the Class seek actual damages, treble damages, attorneys' fees, costs, injunctive relief, and any other relief the Court deems proper pursuant to N.Y. Gen. Bus. Law § 349.

## FIFTEENTH CAUSE OF ACTION

**Violation of the Washington Consumer Protection Act**

**Wash. Rev. Code §§ 19.86.010–19.86.920**

*(Against All Defendants)*

276. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

277. The Washington Consumer Protection Act ("CPA"), Wash. Rev. Code §§ 19.86.010–19.86.920, prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.

278. Defendants committed unfair and/or deceptive acts or practices by,

among other things: making false representations regarding the revenue being generated by other providers of BTL's devices that had the capacity to deceive a substantial portion of the public; promising marketing support, advertising materials, and sales leads that were never provided; imposing and selectively enforcing MAP pricing policies; facilitating prohibited "split" financing transactions; presenting fabricated or grossly inflated sales data; and concealing material terms of financing agreements.

279. Defendants' unfair and deceptive acts occurred in the conduct of trade or commerce within the meaning of the Washington CPA.

280. Defendants' conduct impacts the public interest. Defendants' acts were committed in the course of their business; constitute a pattern or generalized course of conduct directed at numerous consumers and small-business purchasers; involve the repeated use of standardized sales presentations, financing agreements, and MAP policies; and were committed against numerous purchasers who were not in an equal bargaining position with Defendants.

281. Plaintiffs and Class Members suffered injury to their business or property as a direct result of Defendants' unfair and deceptive acts, including payments made under high-interest financing agreements, lost business revenue, inability to compete due to MAP pricing restrictions, and other consequential financial harm.

282. There is a direct causal connection between Defendants' unfair and deceptive acts and Plaintiffs' and Class Members' injuries. But-for Defendants' deceptive representations regarding revenue potential, marketing support, and geographic exclusivity, and but-for Defendants' concealment of material financing terms, Plaintiffs and Class Members would not have purchased BTL devices or entered into the high-interest financing agreements.

283. Plaintiffs and the Class seek treble damages pursuant to Wash. Rev. Code § 19.86.090, injunctive relief, attorneys' fees, costs, and any other relief the

Court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against Defendants as follows:

(a) Certifying this action as a class action, appointing Plaintiffs as the Class representatives, and designating the undersigned as Class Counsel;

(b) A declaration that Defendants are financially responsible for notifying Class Members of the pendency of this suit;

(c) A judgment awarding Plaintiffs and all Class Members restitution and/or other equitable relief, including, without limitation, restitutionary disgorgement of all profits and unjust enrichment that Defendants obtained from Plaintiffs and the Class as a result of the unlawful, unfair and/or fraudulent business practices described herein;

(d) A judgment awarding Plaintiffs and the Class damages under common law and/or by statute, and punitive damages;

(e) An order enjoining Defendants from continuing to violate the UCL and/or FAL as described herein, halting all payments on the fraudulently induced financing agreements, halting all foreclosures and repossession of collateral, and/or an order enjoining Defendants from violating the UCL and/or FAL in the future;

(f) Rescission of the equipment purchase and financing contracts due to fraud, concealment, or failure of consideration;

(g) Double and treble damages pursuant to applicable statutes and laws;

(h) Additional awards for physical, emotional, or economic damage for all senior citizen and disabled Class Members, pursuant to California Civil Code § 1780(b)(1);

(i) A judgment awarding Plaintiffs and Class Members their costs of suit, including reasonable attorneys' fees pursuant to applicable statutes or laws, and pre- and post-judgment interest; and

(j) Granting such other and further relief as this Court may deem just and proper.

Respectfully submitted,

Date: August 20, 2026

**HAINES LAW GROUP, APC**

By: *<u>/s/ Fletcher W. Schmidt</u>*
Fletcher W. Schmidt, Esq.
*Counsel for Plaintiffs*
*and the Proposed Class*

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs hereby demand a trial by jury for all claims so triable.

Respectfully submitted,

Date: August 20, 2026

**HAINES LAW GROUP, APC**

By: *<u>/s/ Fletcher W. Schmidt</u>*
Fletcher W. Schmidt, Esq.
*Counsel for Plaintiffs*
*and the Proposed Class*

# EXHIBIT A

# My Experience

Emface the FIRST two months we did 104 tx's

- 104 x $1000 per treatment= $104,000.
- The cost of pads plus nurse we made $83,200

Emsculpt NEO In two months we averaged 255 tx's

- ($850map) 255 x $850 = $216,750.
- The cost per treatment is about $50 plus nurse $50 = $191,250

**THIS IS A 1 HOUR TREATMENT WITH EM-AZING RESULTS AND ROI!!**



## My Experience

Emface the FIRST two months we did 104 tx's
- 104 x $1000 per treatment= $104,000.
- The cost of pads plus nurse we made $83,200

Emsculpt NEO In two months we averaged 255 tx's
- ($850map) 255 x $850 = $216,750.
- The cost per treatment is about $50 plus nurse $50 = $191,250

**THIS IS A 1 HOUR TREATMENT WITH EM-AZING RESULTS AND ROI!!**




With NEO! In two months we averaged 255 treatments. ($850map) $216750. The cost per treatment is about $50 plus nurse 50 is $191250

Combined treatments in one hour in one treatmmet room $ 274450 Would you be happy with that?? This is just the beginning!!

# EMSCULPT neo® BY THE NUMBERS



## OCTOBER 1, 2022 – DECEMBER 31, 2022

[redacted]
Lifetime Tx 4,485

[redacted]
Lifetime Tx 2,157

[redacted]
Lifetime Tx 2,328

**255**
QUARTERLY TREATMENTS




### PATIENT PROFILE







87.8% 12.2%




### BY BODYPARTS

| | Abdomen | Arms | Calves | Buttock | Pelvic Floor | Other | Total |
|---|---|---|---|---|---|---|---|
| Female | 152 | 10 | 1 | 51 | 0 | 10 | 224 |
| Male | 21 | 1 | 0 | 6 | 0 | 3 | 31 |

### BY AGE

| | <30 | 30 39 | 40 49 | 50 59 | 60+ |
|---|---|---|---|---|---|
| Female | 89 | 86 | 34 | 21 | 3 |
| Male | 6 | 17 | 9 | 3 | 0 |

## AT A GLANCE

**CALIFORNIA**
QUARTERLY SUMMARY

**50**
AVERAGE TREATMENTS




PATIENT PROFILE

84.1% 15.9%










**ERICA KISLER**
kislere@btlnet com
(714) 599-0601
(SALES)



**BRAD HALLOCK**
hallockb@btlnet com
(714) 292-5388
(SALES)



**CHRISTIAN HAERENS**
haerensc@btlnet com
281-685-9383
(SALES)



**ANNELIESE DROETTI**
droettia@btlnet com
(949) 929-9824
(SALES)



**HEATHER FITZGERALD**
fitzgeraldh@btlnet com
(714) 235-0607
(CLINICAL)


©2023 BTL Group of Companies. All rights reserved. BTL® and EMSCULPT® are registered trademarks in the United States of America, the European Union and/or other countries. The products, the methods of manufacture or the use may be subject to one or more U.S. or foreign patents or pending applications.

# EXHIBIT B

From: **Tim Kerr** <kerrt@btlnet.com>
Date: Thu, Jul 11, 2024 at 7:44 PM
Subject: EmFace clinical studies & reference call
To: Dr. Libbi Finnessy <libbithedentist@gmail.com>

Hi Dr. Libbi,

Thanks again for the time earlier and excited to hear that you see Emface as being a great fit for your practice! As a follow up, I've attached a few clinical studies as well as the mechanism of action for you to review.

EmFace: Mechanism of Action on YouTube

The biggest takeaways would be:

1. 20 minute treatment, once a week for 4 weeks.
2. Patients see 23% more lift, **35% less fat in the double chin and jowls**, volume improvement in the upper mid-face of 1.5 syringes of filler equivalent.

3. Completely delegatable to staff so you won't need to be present while the treatments are ongoing.
4. No downtime, no numbing, no needles.
5. Practice success team to work alongside of you to roll out a 30, 60, 90 plan, optimize the package offerings, clinical training so everyone feels confident.
6. Help with marketing via different playbooks and BTL's online, plug-and-play, online library of content.
7. Average practices across the Pacific Northwest average 26 treatments a month. Treatments range from $900-$1,000/session which is $3,600-$4,000 for the series of 4

I've also identified a cosmetic dentist in the community that would be open to speaking with you early next week about their experience with EmFace as well as answer any questions you have too. I can connect the two of you via text tomorrow.

Finally, assuming the call goes well, we'd love to continue the conversation when we're back in town the week of July 22. Would that Monday, the 22nd work to get back together?

Let me know if you have any questions!

Best,
Tim

--
Tim Kerr
Territory Manager PNW
BTL Industries
231-881-7173

www.BTLnet.com
Less is More
More Lift, Less Wrinkles, No Needles

# EXHIBIT C

**BROKER AGREEMENT**

**This Broker Agreement** ("Agreement") is dated as of June 21, 2019 between MMP Capital, Inc., with an address of 19 Engineers Lane, Farmingdale, NY 11735 ("Broker"), and Dext Capital, LLC, with an address of 5285 Meadows Road, Suite 335, Lake Oswego, OR 97035 ("DEXT").

This Agreement shall apply to all transactions ("Transactions") submitted, arranged or referred by Broker to DEXT including loans, equipment finance agreements and other similar transactions (together with all related documents, "Documents") and the vehicles, equipment or property leased or financed in connection with the Transactions ("Equipment"). Nothing herein obligates DEXT to enter into any Transaction and DEXT may reject any or all Transactions presented to it by Broker for any reason whatsoever. With respect to each referral of a Transaction, the Broker and DEXT will execute a Transaction Referral Schedule in the form attached hereto as Exhibit A.

With respect to each Transaction, Broker hereby represents, warrants, covenants and agrees as follows: (1) Broker will conduct itself in the highest ethical standards in all business dealings with DEXT; (2) in all aspects of any Transaction, Broker has conducted its investigation of such Transaction with care and due diligence, and has forwarded all information to DEXT which is known or available to Broker; (3) neither Broker nor its employees will represent themselves to be employees of DEXT and neither will attempt to waive, vary, alter or in any way change or modify the terms and conditions of any transaction, or make commitments for DEXT without the express written consent of DEXT; (4) no aspect of the Transaction involves fraud or misrepresentation by Broker, any lessee, borrower, guarantor or other party to the Transaction (each, an "Obligor"), vendor or other person and the Transaction is bona fide, legal and valid; (5) Broker has not received any prepaid rent, deposit, payment or other advanced amount from any Obligor or from any vendor or other person with respect to the Transaction or the Equipment; (6) to the best of Broker's knowledge, no Obligor is in default under the Documents; (7) to the best of Broker's knowledge, no Obligor has any defense or counterclaim or valid reason to assert that any Document is illegal, invalid or unenforceable in any respect due to any act or omission of the Broker; (8) to the best of Broker's knowledge, all financial and other statements and information, if any, furnished or made by Broker to DEXT are true and correct in all material respects; (9) Broker has full power and authority to execute, deliver and perform its obligations under this Agreement, and this Agreement has been duly authorized by all necessary action of Broker, duly executed on behalf of Broker and constitutes the legal, valid and binding obligation of Broker, enforceable in accordance with its terms; (10) Broker will disclose to DEXT, in writing, promptly upon receiving knowledge thereof any breach or potential breach of this Agreement or falsity of any representation herein or in the Documents; (11) unless disclosed to DEXT in writing, Broker is acting on its sole behalf and is not acting as a "super broker" or "co-broker" or receiving or sharing compensation for handling any Transaction from any third party and the Documents are not being "re-leased" as that term is generally understood in the equipment finance industry, unless such fact is disclosed in writing at the time such Documents are submitted to DEXT; (12) unless disclosed to DEXT by prior written notice, the Documents are not executed in connection with a "split transaction" and DEXT is the only party being requested to provide or providing funding with respect to the Equipment and any other equipment attached to, or used in conjunction with, the Equipment.

Broker hereby agrees to defend, indemnify and hold DEXT (and at DEXT's option its employees, agents, directors, partners, and shareholders) harmless from and against (a) all claims, demands, suits and legal proceedings ("Actions"); and (b) any and all penalties, losses, liabilities damages, costs, attorneys' fees, court costs and any and all other expenses arising out of or resulting from any misrepresentation, breach or default by Broker hereunder or otherwise relating to a Transaction. Upon the occurrence of a Broker Default, Broker shall immediately refund all commissions with respect to such affected Transactions back to DEXT. Broker further agrees to purchase each Transaction subject to a Broker Default on demand from DEXT for an amount equal to DEXT's unamortized investment, including expenses and costs of enforcement in addition to refunding all commissions. EXCEPT AS STATED IN THIS PARAGRAPH, BROKER SHALL HAVE NO PERSONAL LIABILITY TO DEXT FOR A DEFAULT BY ANY OBLIGOR. Fees paid to Broker for each Transaction shall be agreed by Broker and DEXT in writing prior to execution of any Documents as outlined in the Transaction Referral Schedule. As used in this paragraph, "Broker Default" means any representation or warranty by Broker herein or otherwise made to DEXT is breached, untrue or false in any material respect.

Unless otherwise expressly permitted hereby, all communications and notices provided for herein shall be in writing, and any such notice shall become effective when received (and notices given by mail shall be deemed received five (5) days after being deposited in the mail). Any written notice shall be by personal delivery thereof, including, without limitation, by overnight mail and courier service, United States mail, certified, postage prepaid, return receipt requested or facsimile transmission, in each case addressed to the address listed by the recipient's name, above, or as such recipient shall otherwise specify reasonably in advance.

All representations, warranties, covenants, indemnities and agreements made in this Agreement shall survive consummation of the Transactions contemplated hereby. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns. This Agreement may not be changed, modified, waived, discharged or terminated orally or in any manner other than by an instrument in writing, signed by the party against whom the enforcement of such change, modification, waiver, discharge or termination is sought. Each party shall perform any further acts, execute, and deliver any documents, which may be reasonably necessary to carry out the provisions of this Agreement. In the event that it becomes necessary for

DEXT to initiate litigation for the purpose of enforcing any rights hereunder or for the purpose of seeking damages for any violation hereof, then, in addition to all other judicial remedies that may be granted, DEXT shall be entitled to recover reasonable attorneys' fees, whether or not suit is actually filed, and all other costs sustained in connection with such litigation. This Agreement has been drafted by counsel for DEXT as a convenience to the parties only and shall not, by reason of such action, be construed against DEXT or any other party. This Agreement and the written documents referred to or described contain the entire agreement of the parties hereto regarding the transactions contemplated hereby and thereby and supersedes all prior negotiations or agreements, written or oral, among such parties regarding such transactions. The invalidity or unenforceability of any part or clause of this Agreement shall not affect the balance of such agreement. This Agreement and the Transactions assigned under this Agreement are assignable by DEXT and shall inure and run to the benefit of DEXT and its successors and assigns.

This Agreement and all documents executed in connection herewith shall in all respects be governed by and construed in accordance with the laws of the state of Oregon, including all matters of construction, validity and performance. Broker acknowledges that this Agreement was entered into in Clackamas County, Oregon, and that the parties have agreed to the terms hereof with the understanding that any action or proceeding regarding this Agreement or any cause of action whatsoever arising from or related to this Agreement shall be maintained in the state or federal courts in said state and county and Broker hereby submits to jurisdiction and venue, waiving any claim of improper jurisdiction or venue or forum non conveniens, agreeing to accept service at Broker's place of business in any such action. Nothing in this section shall affect the right of any party to serve legal process in any other manner permitted by law or affect the right of any party to bring any action or proceeding in the courts of any other jurisdiction. TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY TO THIS AGREEMENT HEREBY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING HEREUNDER OR IN ANY WAY CONNECTED WITH THIS AGREEMENT.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers as of the date first above written.

DEXT: Dext Capital, LLC

BY: [signature]

Title: COO

Printed Name: ERIC GROSS

BROKER: MMP Capital, Inc.

BY: [signature]

Title: President

Printed Name: John-Paul Smolanski

**ADDENDUM TO BROKER AGREEMENT DATED JUNE 21, 2019 BETWEEN EQUIPMENT DEXT CAPITAL ("DEXT") and MMP CAPITAL, INC. ("Broker") (the "Agreement")**

This Addendum is attached to and hereby incorporated into the Agreement. To the extent that any terms of this Addendum conflict with the provisions of the Agreement, the terms of this Addendum shall control. Capitalized terms that are used herein without definition and that are defined in the Agreement shall have the meanings ascribed thereto in the Agreement.

1. Broker makes the following agreements, covenants, representations and warranties to Dext with respect to each Transaction assigned and/or submitted to Dext on Broker's standard Documents, which covenants, representations and warranties shall be additional to any other such covenants, representations and warranties made in the Agreement.

a. For value received, Broker hereby sells, transfers and assigns to Dext, WITHOUT RECOURSE except as stated herein or in the Agreement, all of Broker's rights, title and interest in the Transaction and Documents and the Equipment and all other personal property, identified as "Equipment" in the Documents, the rent and/or payments under the Documents, all other amounts payable under the Documents or by reason of an default or by reason of damage to the Equipment, all rights in any guaranty of or security for the Documents which may exist), together with all of Broker's rights and remedies under the Documents and any guaranty or endorsement thereof, or with respect to any security therefore, including, without limitation, the right to collect all rents and payments and other sums payable under the Documents such as late fees, casualty value payments, indemnity payments, reimbursements for insurance, transportation, installation or deinstallation, taxes and maintenance. Broker hereby appoints Dext as its agent and attorney-in-fact, coupled with an interest and with full power of substitution except as limited elsewhere in this document, to carry out such actions, and to take any action Dext may deem necessary or appropriate to protect and preserve its interest in the Documents, the Equipment described therein and the proceeds thereof (the "Assigned Interest").

b. If the assignment of the Documents is deemed to be a secured transaction, Broker hereby grants to Dext a security interest in the Assigned Interest and authorizes Dext to file a UCC financing statement as it determines is necessary to protect its interest therein.

c. Deliveries. As a condition precedent to any obligation of Dext to advance the Consideration, Broker shall deliver to Dext (i) a deal sheet in the form attached hereto as Exhibit A; (ii) the sole original counterpart of the Document that qualifies as the sole original chattel paper of the Document for purposes of possession under Article 9 of the UCC; (iii) an executed Notice and Acknowledgment of Assignment in the form attached hereto as Exhibit B by the Customer; (iv) the documents listed on the Deal Sheet and such other documents as reasonably requested by Dext.

All financial information and credit reports about Customer in Broker's possession have been provided to Dext, and such information and reports are accurate, and have not been altered or changed. Broker hereby agrees to indemnify Dext for any failure to comply with the Regulations.

The Documents executed in connection therewith are in compliance with all applicable laws and regulations, including without limitation, usury laws and have not been altered or materially modified from the form previously reviewed and approved for use by Dext.

Broker has completed and complied with all filings and recordings necessary to protect Dext Capital's interest in the Documents and the Equipment including, but not limited to, filings required by the Uniform Commercial.

2. This Addendum may be executed in any number of counterparts, which together shall constitute a singly fully executed Addendum.

**BOTH PARTIES HAVE READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS ADDENDUM AND AGREE TO ITS TERMS.**

Dext Capital, LLC

By: ____________________

Its: COO

Date: ____________________

MMP Capital, Inc.

By: ____________________

Its: President

# EXHIBIT D

AMUR

# BROKER AGREEMENT

THIS BROKER AGREEMENT (this **Agreement**) is entered into as of January 16, 2019, by and between Amur Equipment Finance, Inc., a Nebraska Corporation, located at 308 North Locust Street, Grand Island, NE 68801 (**Amur, also we, us or our**), and MMP Capital Inc., a New York Corporation located at 1061 N. Broadway Massapequa, NY 11758 (**Broker, also you or your**). In consideration of the mutual promises and covenants contained herein, Amur and Broker agree as follows:

1. **Broker Approval and Scope**
Upon entry into this Agreement, Amur shall approve Broker to refer certain proposed equipment lease, equipment financing and/or other financing transactions sought by a customer (each, a **Customer**) for Amur's consideration, subject to the terms and conditions of this Agreement (each, a **Transaction**). This Agreement applies to all Transactions submitted by Broker to Amur until such time as this Agreement is terminated or superseded.

2. **Applications**
For each Transaction, Broker will submit an application signed by the Customer (each, an **Application**), which shall include financial and credit information of the Customer, its principals and each proposed guarantor of the Transaction (each, a **Guarantor**). The Application shall be on a form either approved or supplied by us and include a valid, duly executed, written authorization from the Customer and all Guarantors to obtain credit and financial information at that time (and in the future for any updates, renewals, extensions, amendment or modification) from banks, financial institutions, trade references, credit reporting agencies and others that possess such information (each, a **Credit Authorization**).

3. **Disclosure of Information**
At the time each Application is submitted to Amur, Broker shall promptly provide in writing all information known to Broker concerning the Transaction (collectively, **Broker Information**), including information regarding the (i) Customer, all Guarantors and their respective creditworthiness; (ii) equipment which is the subject of the Transaction (the **Equipment**) and any other collateral pledged by Customer and any Guarantor to secure the Transaction (collectively with the Equipment, the **Collateral**); and (iii) the vendor(s) of the Equipment. Broker's obligation to provide the Broker Information shall continue until the sooner to occur of (x) Amur's rejection of the Application in its sole discretion and (y) the complete satisfaction of Customer's and all Guarantors' obligations to us. If, for as long as a Transaction remains active in our portfolio, Broker becomes aware of any information that (i) supplements, modifies or contradicts any information Broker previously provided to Amur regarding Customer, or Guarantor and any Collateral; and/or (ii) otherwise relates to the creditworthiness, integrity of and/or value (as applicable) of the Customer, any Guarantor, any vendor and/or any Collateral, Broker shall immediately advise Amur of such information in writing. If so requested by Amur, Broker shall also obtain from a Customer any information that Amur may request for as long as a Transaction is active in our portfolio.

4. **Approvals**
Amur may approve or reject any Application in its sole discretion. If Amur approves an Application (an **Approval** or **Approved Transaction**), Amur shall promptly advise Broker of such Approval and Broker shall then promptly advise Customer.

5. **Rejections**
If an Application is rejected in whole or in part, Amur shall advise Broker and Broker shall advise Customer and all Guarantors of the rejection in writing. Broker shall maintain all rejection notices sent for three (3) years from the date the notice is sent and shall provide Amur with the right to inspect and review those notices and related documents upon seven (7) days written notice. If Customer or any Guarantor requests additional information regarding rejection, Broker shall advise Amur and Amur shall assist Broker with preparation of any additional notice required to be delivered to Customer or Guarantor pursuant to all applicable laws and regulations including the Equal Credit Opportunity Act and Fair Credit Report Act (collectively, the **Credit Regulations**). Broker shall at all times be responsible for delivery of all notices as may be required under the Credit Regulations.

6. **Documentation**
Upon Acceptance, Amur shall prepare all documents necessary to complete the Transaction consistent with the terms of the Approval (the **Contract Documents**). Contract Documents shall include any modification, amendment or supplement subsequently required by Amur. The Broker shall have responsibility for obtaining all necessary signatures and returning the executed Contract Documents to Amur, together with payments, documentation fees and any other initial payment required thereunder. All Approved Transactions shall be documented to Amur's complete satisfaction; any contract forms used by Broker that are not Amur's approved forms shall be pre-approved by us in our sole discretion.

7. **Closing and Funding**
Amur shall not be required to close and fund an Approved Transaction (a **Closing**) until (i) Amur receives all required Contract Documents, in satisfactory form and properly executed by the Customer and all Guarantors and (ii) all conditions precedent listed in the Approval have been satisfied.

8. **Broker Fee**
The Broker Fee shall be determined solely by reference to Amur's Broker Fee Policy (the **Fee Policy**) in effect at the time the Application is submitted and shall be final and non-appealable. The Broker Fee shall be the sole compensation to Broker from Amur for each Transaction and Broker shall be solely liable for all of Broker's costs and expenses in connection with each Application and Transaction. Broker shall not be entitled to any fee or other compensation for rejected Applications or Transactions that do not go to Closing for any reason. The Fee Policy is subject to change at any time. Broker will be solely responsible for federal, state or local income taxes owed by Broker and for any expenses of any kind as well as salaries, benefits and commissions due to its employees and agents.

9. **Independent Contractor; Authority of Broker**
Broker is an independent contractor and not an employee or agent of Amur and there is no partnership, joint venture or similar arrangement or relationship between Amur and Broker. Broker shall have no authority to bind Amur, incur any obligations for or on behalf of Amur and/or modify any Contract Documents. Broker may not use Amur's name, logos, trademarks, trade names, service marks, or other intellectual property.

10. **Broker Representations, Warranties, Covenants and Additional Terms**
Broker represents to, warrants to, and covenants with Amur and otherwise agrees as follows:

(a) All information concerning the Broker provided by Broker to Amur (including the information in the application submitted by Broker to be approved as a broker under this Agreement) is accurate and complete and Broker will provide such updated information to Amur from time to time so that such information will remain accurate and complete;

(b) Broker represents that prior to submitting an Application to Amur, it has (i) obtained a valid and duly executed Credit Authorization from each of Customer, its principal(s) and its Guarantors (and if an entity, its respective principals); and (ii) complied with all laws and regulations related thereto. Broker shall provide written evidence of such Credit Authorization upon request from Amur;

(c) Each Application, the corresponding Broker Information and all documents signed by Broker shall contain complete and accurate information as well as genuine signature of the parties signing those documents;

(d) Each Application will represent the entire Transaction and Broker shall disclose to Amur (in writing at the time of submission of the Application) all other applications for credit and/or other equipment financing being sought or processed by Customer and/or the Guarantors at that time (or intends to be sought or processed by them) from any financing source;

(e) No Transaction shall be divided among various funding sources unless Broker has disclosed such information in writing to, and has been approved by, Amur on or before the Closing;

(f) Each signature executed by Customer and/or Guarantor is the genuine signature of such signer, binds the signer, is a bona fide obligation of the Customer, Guarantor and/or other third party, respectively and will be valid and enforceable according to its terms;

(g) ALL TRANSACTIONS SUBMITTED WILL BE FOR BUSINESS OR COMMERCIAL PURPOSES ONLY and not for personal, family, or household purposes;

(h) Broker is the type of entity set forth herein, and is organized and in good standing in the state set forth herein, and is duly qualified, in good standing in each necessary jurisdiction to carry out any of its obligations under this Agreement and this Agreement has been duly authorized and executed by Broker and represents Broker's valid and legally binding obligation, enforceable against it in accordance with its terms;

(i) Broker (i) will perform its obligations in good faith and in a professional and ethical manner; (ii) has and will comply with all applicable laws, rules, regulations and orders of all governmental entities and will maintain all appropriate licenses and qualifications applicable and necessary to carry out its business under this Agreement;

(j) Broker is not in default under any other agreement to which it is a party and there are no claims, litigations, investigations or proceedings pending or, threatened against Broker except as previously disclosed in writing by Broker to Amur. Broker shall notify Amur in writing within ten (10) days of occurrence of any claims, litigations, investigations or proceedings pending or threatened against Broker;

(k) Broker (i) will be the sole originator of a Transaction that is the subject of the corresponding Application; (ii) is not re-brokering a Transaction; and (iii) will not accept any compensation, commission, rebate or other remuneration or consideration of any kind whatsoever from the Customer, any Guarantor, any vendor and/or any third party with respect to the Transaction except as disclosed in writing to Amur at the time that the corresponding Application is submitted; and

(iv) will not, directly or indirectly, pay any amount owed by any Customer or Guarantor under any Transaction or Contract Documents, including by way of any loans, advance, reimbursement or rebate;

(l) Broker is independent of all vendors, Customers and Guarantors on each Transaction and all Transactions have been negotiated in good faith and at arms-length by and between the Broker, any vendor, Customer and any Guarantor;

(m) Other than the Broker Fee (if and when earned hereunder), no other fee or compensation of any kind will be due by Amur to Broker or any third party (except for the financing being paid to the vendor(s) with respect to any Transaction);

(n) No Broker Fee will be divided, shared or paid to Customer or Guarantor and, as to any non-Customer and/or non-Guarantor, no Broker Fee will be divided, shared or paid to any other person or entity other than as disclosed in writing by Broker to Amur at the time that the corresponding Application is submitted to Amur;

(o) Broker will not in any manner (written, verbal or otherwise) make any agreements with or statements to Customer that in any way conflict with or purport to modify, supplement or explain the terms of Amur's Approval or any Contract Documents, including with respect to purchase, renewal, early termination or cancellation rights or options, as well as any subsequent modification or amendment to the Approved Transaction required by us;

(p) All Equipment which is the subject of a Transaction will be new, unless otherwise disclosed in writing to Amur at the time the Application is submitted;

(q) Broker will immediately inform Amur in writing of any (i) dispute arising between the Customer, any Guarantor, any vendor and/or Broker, including any actual, pending or threatened suit, demand, counterclaim or set-off; and (ii) assignment for the benefit of creditors, cessation of business or bankruptcy, insolvency or receivership of any Customer, Guarantor or vendor of which Broker has or should have knowledge;

(r) All of Broker's representations, warranties and obligations under this Agreement extend and apply to all Broker's employees, agents, independent contractors and/or other person/entities that provide information to Broker concerning each Application and Transaction.

(s) These representations, warranties, covenants and terms, are continuing and shall survive termination of this Agreement. Broker will provide additional information to Amur as is necessary to maintain and confirm the accuracy and completeness of these representations, warranties, covenants and other agreements provided for in this Agreement.

11. Credit and Information Disclosure

Broker confirms that it previously authorized, and hereby authorizes Amur to obtain (at any time from the date the submission of Broker's application to Amur through any termination of this Agreement) any credit, financial, trade and/or business information on Broker from any bank, financial institution, credit reporting agency, trade reference and/or any other person or entity.

12. Termination

Either party may terminate this Agreement upon ninety (90) days' written notice to the other, provided, that such termination shall not affect the respective rights and obligations of the parties with respect to all Applications, Transactions and Approved Transactions submitted prior to the effective date of termination. Amur shall have the right (but not the obligation) to take to Closing any Applications, Transactions and Approved Transactions in existence prior to the effective date of termination of this Agreement, even if such Closing occurs after the effective date of termination.

13. Default and Remedies

(a) *Broker Default.* Broker will be in default under this Agreement if Broker fails to comply with any of its representations, warranties, covenants or other terms and/or agreements hereunder and such failure is not cured within ten (10) days of written notice from Amur to Broker (a **Default**). Upon any Default, upon Amur's written demand, Broker will purchase such Transaction(s) from Amur for an amount (the **Purchase Price**) equal to the sum of (i) the aggregate amount of all accrued and unpaid Transaction payments and other charges then due by Customer plus the accelerated balance of all future Transaction payments (and if provided under the relevant Contract Documents upon the occurrence of a default thereunder, less a present value discount), (ii) the aggregate amount of the Broker Fee paid to the Broker as of such date and (iii) all Enforcement Costs defined herein. Absent manifest error, Amur's determination of the Purchase Price shall be final, binding and non-appealable. Broker shall pay Amur the Purchase Price in immediately available funds within five (5) business days of such written demand and upon payment, Amur will then convey all of its right, title and interest in and to the Transaction and Collateral to Broker without recourse or warranty of any kind. Upon payment of the Purchase Price, Amur shall assign the corresponding Contract Documents (and any such enforcement efforts, including legal proceedings) to Broker. Any amount of any Broker Fee due but not yet paid to Broker as of the date of any Default shall be deemed cancelled. In the event Broker is assigned Amur's rights under any legal proceeding and/or judgment, Broker shall within thirty (30) days take whatever steps are necessary to change the captions of any legal proceeding or judgment to reflect that Broker is the assignee of Amur under that legal proceeding and/or judgment.

MM

(b) *Customer Default.* If a Customer fails to make any portion of the first, second or third monthly payment due and payable to Amur following any Closing and such failure continues for ninety (90) days after the respective due date of each such payment, Broker agrees to return to Amur the total amount of the Broker Fee paid to Broker for the applicable Transaction. If a Customer fails to make any portion of the fourth, fifth or sixth monthly payment due and payable to Amur following any Closing and such failure continues for ninety (90) days after the respective due date of each such payment, Broker agrees to return to Amur 50% of the total amount of the Broker Fee paid to Broker for the applicable Transaction. All amounts payable by Broker hereunder shall be paid in immediately available funds within five (5) business days of written demand. Amur shall have the right to set off any amount payable by Broker to Amur hereunder against any other amount payable by Amur to Broker.

(c) *Reservation of Rights.* Upon any event described above, Amur shall also have all of the rights and remedies available under applicable law or in equity. Notwithstanding anything to the contrary, whether or not Broker is in Default, Amur has the right to enforce any Contract Documents against Customer, any Guarantor, any Collateral and/or any other party.

**14. Enforcement Costs**

Enforcement Costs shall refer to all attorney fees, other legal fees, costs and other expenses we incur by reason of any Default or the exercise or preservation of our rights or remedies, in bankruptcy or otherwise, under this Agreement or the Contract Documents (whether or not you, the Customer and/or any Guarantor are in default of this Agreement and/or any Contract Documents, as applicable), including all expenses related to the return, repossession, refurbishing, recovery, advertising, sale, re-lease or other disposition of any Collateral.

**15. Indemnification**

Broker shall indemnify, defend, and hold harmless Amur, its affiliates, and their respective officers, directors, employees, and agents (each, an **Indemnitee**) from and against any and all losses, damages, actions, claims, demands and expenses, including reasonable attorneys' fees, expenses and other Enforcement Costs, which are asserted against or incurred by an Indemnitee and which arise out of (i) Broker's submission of an Application hereunder, (ii) Amur's dealings with any Customer or (iii) any Default by Broker under this Agreement or (iv) any other matter relating to the terms of this Agreement.

**16. Assignment**

(a) You may not assign, delegate or transfer any of your rights or responsibilities under this Agreement, which shall be binding upon you and inure to the benefit of us and our assigns.

(b) We may sell, transfer, assign or otherwise convey to any affiliated or unaffiliated person or entity (an **Assignee**) any or all of our rights, interests and benefits under this Agreement (an **Assignment**), whether in whole or in part, without notice to you or your consent. You acknowledge and agree that, if we make an Assignment: (i) such Assignee shall have the rights and benefits we convey under such Assignment, but not the obligation to perform any of our obligations; (ii) such Assignee's rights shall not be subject to any claims, defenses or set-offs that you may have against us; (iii) you shall perform all the obligations hereunder for the Assignee, if required under such Assignment; and (iv) if so directed by us, you shall acknowledge such Assignment.

**17. Choice of Law and Service of Process**

THIS AGREEMENT, ALL CONTRACT DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES THEREUNDER SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEBRASKA (WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES OF SUCH STATE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, REGARDLESS OF THE LOCATION OF ANY CUSTOMER, GUARANTOR AND/OR THE COLLATERAL. THE PARTIES HEREBY AGREE TO THE NONEXCLUSIVE VENUE AND JURISDICTION OF ANY STATE OR FEDERAL COURT PRESIDING IN NEBRASKA FOR ALL ACTIONS, PROCEEDINGS, CLAIMS, COUNTERCLAIMS OR CROSS-CLAIMS ARISING DIRECTLY OR INDIRECTLY, IN CONNECTION WITH, OUT OF, OR IN ANY WAY RELATED TO THIS AGREEMENT, THE CONTRACT DOCUMENTS AND/OR THE COLLATERAL. The provisions of this paragraph are not exclusive insofar as we are concerned and do not prohibit us from commencing any necessary legal action or instituting any appropriate proceeding in any court of competent jurisdiction or venue. You agree that any service of process can be effectuated under applicable law and can also be sufficiently served if sent to you by any nationally recognized overnight delivery service such as Federal Express, UPS, or US Priority Mail Express (each, a **National Delivery Service**) to the address set forth above and deemed complete two (2) business days after the same has been sent as aforesaid.

**18. Waiver of Jury Trial**

EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY OF ANY CAUSE OF ACTION, CLAIM, COUNTERCLAIM OR CROSS-COMPLAINT IN ANY ACTION OR PROCEEDING TO WHICH IT MAY BE A PARTY

MM

REGARDING ANY MATTER WHATSOEVER RELATED TO THIS AGREEMENT, THE CONTRACT DOCUMENTS AND THE COLLATERAL.

**19. Miscellaneous**

(a) *Attorney-in-Fact.* You hereby irrevocably appoint us to be your attorney-in-fact with the power to: (i) sign and file on your behalf any document we deem necessary to perfect, protect or enforce our interest in this Agreement; (ii) make claims for, receive payments under, and execute and endorse all documents, checks or drafts to which we are entitled under this Agreement; (iii) complete any blanks, correct any mistakes and update your contact information in this Agreement; (iv) take any action authorized by this Agreement; and (v) grant any of these powers to any of our agents.

(b) *Amendments and Entire Agreement.* This Agreement may only be amended in writing when signed by all parties hereto. Broker agrees that this Agreement represents the entire agreement between you and us pertaining to the subject matter hereof and of supersedes all prior or contemporaneous agreements, understandings, negotiations and communications concerning the same subject matter.

(c) *Severability.* If any provision or remedy in this Agreement is found to be invalid, the remaining provisions or remedies shall be given effect in accordance with the manifest intent hereof. You agree that a waiver of a Default shall not represent a waiver of any other subsequent Default, and that any delay or failure to enforce our rights does not prevent us from enforcing any rights at a later time.

(d) *Notices.* Notice can be sent to Broker (i) if by hardcopy, at its address set forth herein by any National Delivery Service, with such notice being deemed effective two (2) business days after it is sent; or (ii) if by telecopier or email, with such notice being deemed effective when we send it.

(e) *Communications/Marketing.* You agree that by providing us, now or in the future, with an email address or telephone number for a wireless device, you expressly consent to receiving communications including email, voice and text messages from us or our affiliates or assigns at that email address or telephone number, regardless of their purpose, including marketing, advertising or collection purposes. These calls and messages may be subject to access and/or other fees from your internet or wireless provider. Your consent to this is not a condition of doing business with, or making a purchase of any goods/services from, us. You may unsubscribe or opt-out of any such further telemarketing calls or marketing text messages at any time.

(f) *Survival.* All your obligations and our rights hereunder shall survive the expiration or earlier termination of this Agreement.

(g) *Further Assurances.* Broker will execute and deliver such further documents and perform such further acts as reasonably requested by Amur in order to give effect to the terms and conditions contemplated herein.

(h) *Headings.* Headings are for convenience only.

(i) *Execution.* This Agreement may be executed in separate counterparts which together shall constitute one and the same instrument. This Agreement may be signed electronically or digitally and all signatures transmitted by facsimile, email, digital photograph or other electronic means shall for all purposes be deemed effective, binding, legally admissible and have the same effect as a manually applied ink signature.

SIGNATURES TO FOLLOW ON THE NEXT PAGE

Signature Page to Broker Agreement

| BROKER | MMP Capital Inc. | AMUR EQUIPMENT FINANCE, INC. | |
|---|---|---|---|
| Signature | | Signature | |
| Name | Michael McCaffrey | Name | TODD [illegible] |
| Title | Secretary | Title | VP, DIRECTOR OF RISK |

# EXHIBIT E

**From:** John-Paul M. Smolenski [jp@mmpcapital.com]
**Sent:** 11/15/2024 10:05:12 PM
**To:** Todd Wainwright [TWainwright@goamur.com]
**CC:** John-Paul M. Smolenski [jp@mmpcapital.com]
**Subject:** [External] RE: Potential split transactions review follow up
**Attachments:** MMP Transaction w Multiple Levels of Exposure - Amur List 11-2024 -.xlsx

Todd,

I went through the remainder. Notes below. Based on Amur's numbers, 4.5mm is eligible for refund due to combo deals for 2 different machines that are 100% independent of one another. Of the deals that are not performing based on Amur's report, 1.6mm are not current (past due, charge off, legal.. not current). If the customer is current, and paying Amur… I would imagine that Amur just added the deal to the report, but if they are paying… why would they want to sell the deal to MMP.

So really the number is 1.6mm.

Thank you,
JP



mmpcapital.lightning.force.com/lightning/r/Account/0015b00001pIN8OAAU/related/Opportunities/view?ws=%2Flightning%2Fr%2FAccount%2F0015b00001pIN8OAAU%2...

Sales Console | Dashboards | MMP Capital Te... | Deutsche Bank: ... | Angela Myers N... | Uptown Medisp... | Lina Haisha | Ac... | Nardin Hermiz ...

Accounts > Nardin Hermiz RN

**Opportunities**

14 Items • Sorted by Close Date • Updated a minute ago

| | Opportunity Name | Total Amo... | Opportunity Manager | Stage | Close D... | Underwriter | Assignee | Product Type | Payment S... |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Nardin Hermiz RN - 150k Emsculpt Neo | $165,208.68 | Christopher Hagmaier | Closed Won | 9/14/2021 | Quality Leasing | | EFA | Current |
| 2 | Nardin Hermiz RN - 139k Emsella | $152,978.00 | Christopher Hagmaier | Closed Won | 9/21/2021 | MMP Capital | Amur Equipment Fina... | EFA | Past Due |
| 3 | Nardin Hermiz RN - 40k Working Capital | $40,000.00 | Christopher Hagmaier | Closed Lost - No Purchase | 11/30/2021 | | | Working Capital | Current |
| 4 | Nardin Hermiz RN - 100k Emtone - LA EVENT | $110,390.00 | Christopher Hagmaier | Closed Won | 12/14/2021 | MMP Capital | North Mill Equipment ... | EFA | Current |
| 5 | Nardin Hermiz RN - 50K LOC | $50,000.00 | Jon McGibbon | Closed Lost - No Purchase | 3/4/2022 | | | Working Capital | Current |
| 6 | Nardin Hermiz RN - 89k Sylfirm X Ultimate Edition | $89,900.00 | Jon McGibbon | Closed Won | 4/18/2022 | MMP Capital | Slim Capital | EFA | Current |
| 7 | Nardin Hermiz RN - 159k LaseMD Ultra | $159,447.00 | Robert Naughton-frozen | Closed Lost | 5/24/2022 | MMP Capital | Dext Capital | EFA | Current |
| 8 | Nardin Hermiz RN - 675k SBA | $675,000.00 | Jon McGibbon | Closed Lost - No Purchase | 6/2/2022 | | | Working Capital | Current |
| 9 | Nardin Hermiz RN - 125k Clarity 2 | $135,563.75 | Corey Aronoff | Closed Won | 10/14/2022 | MMP Capital | Dext Capital | EFA | Current |
| 10 | Nardin Hermiz RN - 90k - Genius | $96,043.20 | Corey Aronoff | Closed Lost - No Purchase | 12/30/2022 | Quality Leasing | | EFA | |
| 11 | Nardin Hermiz - 50k Working Capital | $50,000.00 | Corey Aronoff | Closed Lost - No Purchase | 1/31/2023 | | | Working Capital | |
| 12 | Nardin Hermiz RN - Working Capital | $50,000.00 | Ryan Graziano | Closed Lost - Credit | 4/14/2023 | | | Working Capital | |
| 13 | Nardin Hermiz RN - 90k Ultra | $98,572.25 | Corey Aronoff | Closed Lost | 4/28/2023 | TimePayment | | EFA | |
| 14 | Nardin Hermiz RN - SBA Loan | $850,000.00 | Ryan Graziano | Closed Lost - Credit | 8/10/2023 | | | SBA | |

History | Recent Items | Messenger | To Do List

mmpcapital.lightning.force.com/lightning/r/Account/0010a00001G9DyaAAF/related/Opportunities/view?ws=%2Flightning%2Fr%2FAccount%2F0010a00001G9DyaAAF%2F...

Sales Console | Dashboards | MMP Capital Team D... | Deutsche Bank: Pled... | Angela Myers NP ** |... | The Beauty Clinic, Inc... | Lina Haisha | Account

Accounts > Lina Haisha

**Opportunities**

8 Items • Sorted by Close Date • Updated a few seconds ago

| | Opportunity Name | Total Amo... | Opportunity Manager | Stage | Close D... | Underwriter | Assignee | Product Type | Payment S... |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Beauty Clinic - Handpiece | $22,000.00 | Mike McCaffrey | Closed Won | 10/31/2017 | Pawnee Leasing | | EFA | Current |
| 2 | The Beauty Clinic - 55K Lightsheer | $27,500.00 | Mike McCaffrey | Closed Won | 1/29/2018 | Financial Pacific | | EFA | Current |
| 3 | The Beauty Clinic - GentleMax or UltraVenus | $70,000.00 | Shamus Naughton | Closed Lost - Competitor | 6/25/2019 | | | | |
| 4 | The Beauty Clinic - 30K Legend & OxyGeneo | $35,253.86 | Shamus Naughton | Closed Lost - Competitor | 7/2/2019 | BSB Leasing | | | |
| 5 | The Beauty Clinic - 30K Diamond Glow & Zimmer Chiller | $30,000.00 | Shamus Naughton | Closed Lost - No Purchase | 11/30/2020 | | | EFA | Current |
| 6 | Lina Haisha - 85k Splendor X | $92,114.00 | Corey Aronoff | Closed Won | 10/25/2021 | Quality Leasing | | EFA | Current |
| 7 | Lina Haisha - 159k Emsculpt Neo | $169,907.40 | Corey Aronoff | Closed Won | 11/5/2021 | Amur Equipment Finan... | Amur Equipment Fina... | EFA | Current |
| 8 | Lina Haisha - 180k Emsculpt Neo*** DETROIT EVENT | $192,167.40 | Christopher Hagmaier | Closed Lost | 1/20/2022 | | | EFA | Current |

History | Recent Items | Messenger | To Do List

Opportunities | Sa… | Team Pipeline Re… | Team Funded Pip… | Aesthetic Laser C… | Alma - Funded P… | Term SOFR - CME | (26) George Atki…

mmpcapital.lightning.force.com/lightning/r/Account/0015b00001jEu8XAAS/related/Opportunities/view?ws=%2Flightning%2Fr%2FAccount%2F0015b00001jEu8XAAS%2Fvi...

TVal | MD License | DocInfo | SalesForce | Forte | Dex | PayNet | Experian | Deutsche Bank | Chase | Signature | TLO | SOFR | NMEF Portal | Alma Calc

Search...

Sales Console | Dashboards | MMP Capital Te... | Deutsche Bank:... | Dr. Michael Ma... | Cosmo Contour... | Jennifer Burns ... | Nicole King | Ac...

Nicole King | Acc... | Opportu...

Accounts > Nicole King

**Opportunities**

New

16 items • Sorted by Close Date • Updated a few seconds ago

| | Opportunity Name | Total Amo... | Opportunity Manager | Stage | Close D... | Underwriter | Assignee | Product Type | Payment S... |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Nicole King - 90K Tempsure | $99,097.50 | Benedict Arnold-frozen | Closed Lost - No Contact | 1/20/2021 | | | EFA | Current |
| 2 | Nicole King - 179k Emsculpt Neo | $189,417.55 | Christopher Hagmaier | Closed Won | 11/12/2021 | MMP Capital | Amur Equipment Fina... | EFA | Current |
| 3 | Nicole King - 19.5k LOC Draw #1 | $19,500.00 | Jon McGibbon | Closed Won | 1/17/2022 | BlueVine Capital | | Working Capital | Current |
| 4 | Nicole King - 19.2k Working Capital | $19,200.00 | Jon McGibbon | Closed Won | 2/3/2022 | Kapitus | | Working Capital | Current |
| 5 | Nicole King - 80k Eon | $87,600.00 | Jon McGibbon | Closed Lost | 2/16/2022 | | | EFA | Current |
| 6 | Nicole King - 35K Z Wave | $34,952.00 | Ryan Graziano | Closed Won | 8/9/2022 | Amur Equipment Finan... | Amur Equipment Fina... | EFA | Past Due - L |
| 7 | Nicole King - 90K Morpheus 8 | $99,645.00 | Ryan Graziano | Closed Won | 9/6/2022 | MMP Capital | MMP Capital | EFA | Default - In |
| 8 | Nicole King - 30K | $30,000.00 | Ryan Graziano | Closed Lost - No Purchase | 10/21/2022 | NCMIC | | EFA | |
| 9 | Nicole King - 96K Evolve | $105,120.00 | Ryan Graziano | Closed Won | 11/14/2022 | Quality Leasing | | EFA | Current |
| 10 | Nicole King - 20K Morpheus8 | $21,900.00 | Ryan Graziano | Closed Won | 11/18/2022 | NCMIC | | EFA | Current |
| 11 | Nicole King - 111k Optimas | $122,092.50 | Ryan Graziano | Closed Won | 11/29/2022 | MMP Capital | NEC Financial | EFA | Past Due |
| 12 | Nicole King - 30K Working Capital | $30,000.00 | Ryan Graziano | Closed Lost - No Purchase | 12/16/2022 | | | Working Capital | |
| 13 | Nicole King - LOC/SBA | $100,000.00 | Ryan Graziano | Closed Lost - No Purchase | 12/19/2022 | | | SBA | |
| 14 | Nicole King - InMode Device | $106,000.00 | Ryan Graziano | Closed Lost - Other | 12/30/2022 | | | EFA | |
| 15 | Nicole King - 19.2k Working Capital Renewal | $19,200.00 | Jon McGibbon | Closed Won | 2/2/2023 | Kapitus | | Working Capital | Current |
| 16 | Nicole King - 17k Working Capital Renewal | $17,000.00 | Jon McGibbon | Closed Won | 5/13/2024 | Kapitus | | Working Capital | Current |

History | Recent Items | Messenger | To Do List

Opportunities | Sa… | Team Pipeline Re… | Team Funded Pip… | Aesthetic Laser C… | Alma - Funded P… | Term SOFR - CME | (26) George Atki…

mmpcapital.lightning.force.com/lightning/r/Account/0015b00001rdbfSAAQ/related/Opportunities/view?ws=%2Flightning%2Fr%2FAccount%2F0015b00001rdbfSAAQ%2Fvi...

TVal | MD License | DocInfo | SalesForce | Forte | Dex | PayNet | Experian | Deutsche Bank | Chase | Signature | TLO | SOFR | NMEF Portal | Alma Calc

Search...

Sales Console | Dashboards | MMP Capital Team D... | Deutsche Bank Pled... | Dr. Michael Magee *... | The Bienetre Center ... | Jennifer Burns ND ** ...

Jennifer Burns N... | Opportu...

It looks as if duplicates exist for this Account. View Duplicates

Accounts > Jennifer Burns ND **

**Opportunities**

New

2 items • Sorted by Close Date • Updated a few seconds ago

| | Opportunity Name | Total Amo... | Opportunity Manager | Stage | Close D... | Underwriter | Assignee | Product Type | Payment S... |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Jennifer Burns ND - 150k Emsculpt Neo | $164,190.00 | Christopher Hagmaier | Closed Won | 11/26/2021 | MMP Capital | Amur Equipment Fina... | EFA | Default |
| 2 | Jennifer Burns ND - 120k Emsella | $131,612.34 | Christopher Hagmaier | Closed Lost | 2/5/2022 | Quality Leasing | | EFA | Current |

History | Recent Items | Messenger | To Do List

Opportunities | Sa… | Team Pipeline Re… | Team Funded Pip… | Aesthetic Laser C… | Alma - Funded P… | Term SOFR - CME | (26) George Atkin…

mmpcapital.lightning.force.com/lightning/r/Account/0015b00001ojZ54AAE/related/Opportunities/view?ws=%2Flightning%2Fr%2FAccount%2F0015b00001ojZ54AAE%2Fvi...

TVal | MD License | DocInfo | SalesForce | Forte | Dex | PayNet | Experian | Deutsche Bank | Chase | Signature | TLO | SOFR | NMEF Portal | Alma Calc

Search...

Sales Console | Dashboards | MMP Capital Team D... | Deutsche Bank Pled... | Dr. Jimmy Huebert | ... | Dr. David Mabry ** | ... | Dr. John Sosa - IN LE...

Dr. John Sosa - I... | Opportu...

Accounts > Dr. John Sosa - IN LEGAL DO NOT SOLICIT

**Opportunities**

New

10 items • Sorted by Close Date • Updated a few seconds ago

| | Opportunity Name | Total Amo... | Opportunity Manager | Stage | Close D... | Underwriter | Assignee | Product Type | Payment S... |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Dr. John Sosa - 250k Emtone / Exilis | $271,308.50 | Christopher Hagmaier | Closed Won | 4/15/2022 | Amur Equipment Finan... | Amur Equipment Fina... | EFA | Past Due - L |
| 2 | Dr. John Sosa - 93k LOC | $93,000.00 | Jon McGibbon | Closed Won | 4/21/2022 | BCC USA | | Working Capital | Current |
| 3 | Dr. John Sosa - 100k Emsella | $112,529.25 | Christopher Hagmaier | Closed Lost - Other | 6/28/2022 | Centra Funding | | EFA | Current |
| 4 | Dr. John Sosa - 349k Cellutone **MIAMI EVENT BLACKHAW... | $371,405.00 | Christopher Hagmaier | Closed Lost - Other | 10/30/2022 | | | EFA | |
| 5 | Dr. John Sosa - 140K Optimas | $141,450.00 | Shamus Naughton | Closed Won | 11/29/2022 | MMP Capital | North Mill Equipment ... | EFA | Default - Re |
| 6 | Dr. John Sosa - 180K Elite IQ | $195,644.63 | Michael Mauri | Closed Lost - No Purchase | 2/5/2023 | MMP Capital | North Mill Equipment ... | EFA | |
| 7 | Dr. John Sosa - 149k Exion **ORLANDO EVENT** (Repo'd) | $159,505.00 | Christopher Hagmaier | Closed Won | 5/19/2023 | MMP Capital | MMP Capital | EFA | Default - In |
| 8 | Dr. John Sosa (UTOPIC HEALTH PLLC) - 90K Triton | $96,750.00 | Shamus Naughton | Closed Won | 10/10/2023 | MMP Capital | NEC Financial | EFA | Past Due |
| 9 | Dr. John Sosa - 159k Emsculpt Neo | $162,744.25 | Christopher Hagmaier | Closed Lost - Inactive | 11/5/2023 | MMP Capital | NEC Financial | EFA | |
| 10 | Dr. John Sosa (UTOPIC HEALTH PLLC) - 1.75mm SBA | $1,750,000.00 | Ryan Graziano | Closed Lost - Credit | 1/26/2024 | | | SBA | |

History | Recent Items | Messenger | To Do List


**John-Paul M. Smolenski**
President & CEO

**e:** jp@mmpcapital.com
**o:** (516) 454-4572 | **m:** (516) 606-8354 | **f:** (516) 400-2071


***"Success is not owned, it's leased, and rent is due everyday." – J.J. Watt***

APPLY HERE

Forbes | Finance Council 2024 OFFICIAL MEMBER

NEFA ELFA

BBB Accredited Business A+ Rating

BusinessNews

---

**From:** John-Paul M. Smolenski <jp@mmpcapital.com>
**Sent:** Thursday, November 14, 2024 6:03 PM
**To:** Todd Wainwright <TWainwright@amuref.com>
**Cc:** John-Paul M. Smolenski <jp@mmpcapital.com>
**Subject:** RE: Potential split transactions review follow up

Todd,

I am going through the list…. As of now, I am 20 deals through the list. About half were combo deals with Amur & NMEF.

Accounts > Dr. Ryan Ramos
**Opportunities**
6 Items • Sorted by Close Date • Updated a few seconds ago

| | Opportunity Name | Total Amo... | Opportunity Manager | Stage | Close D... | Underwriter | Assignee | Product Type | Payment S... |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Dr. Ryan Ramos - 260k Emsculpt Neo | $277,015.00 | Christopher Hagmaier | Closed Won | 5/5/2022 | MMP Capital | North Mill Equipment ... | EFA | Past Due - L |
| 2 | Dr. Ryan Ramos - 250k Emsella | $248,215.00 | Christopher Hagmaier | Closed Won | 6/22/2022 | Amur Equipment Finan... | Amur Equipment Fina... | EFA | Past Due - L |
| 3 | Dr. Ryan Ramos - 179k Emtone ***ORLANDO EVENT*** | $190,955.00 | Christopher Hagmaier | Closed Won | 6/30/2022 | MMP Capital | MMP Capital | EFA | Default - In I |
| 4 | Dr. Ryan Ramos - 250k Emface | $266,415.00 | Christopher Hagmaier | Closed Lost | 4/19/2023 | | | EFA | |
| 5 | Dr. Ryan Ramos - 150k Exion | $160,579.40 | Christopher Hagmaier | Closed Lost - Inactive | 12/25/2023 | MMP Capital | North Mill Equipment ... | EFA | |
| 6 | Dr. Ryan Ramos - 100k Cellutone | $106,620.00 | Christopher Hagmaier | Closed Lost - Inactive | 1/1/2024 | | | EFA | |

Accounts > Dr. Stanley Librach - No Additional Funding is Permitted - Customer is going to Jail 10/2024
**Opportunities**
10 Items • Sorted by Close Date • Updated a few seconds ago

| | Opportunity Name | Total Amo... | Opportunity Manager | Stage | Close D... | Underwriter | Assignee | Product Type | Payment S... |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Dr. Stanley Librach - 100K Versus Versa | $109,613.00 | Sean Etherson | Closed Won | 9/9/2021 | MMP Capital | Balboa Capital | EFA | Default - In I |
| 2 | Dr. Stanley Librach - 229k Emsculpt Neo/ EmFemme 360 | $241,255.25 | Christopher Hagmaier | Closed Won | 8/8/2022 | Amur Equipment Finan... | Amur Equipment Fina... | EFA | Default - In I |
| 3 | Dr. Stanley Librach - 99k Cellutone | $104,372.75 | Christopher Hagmaier | Closed Won | 8/18/2022 | MMP Capital | Flagstar (Signature) | EFA | Past Due |
| 4 | Dr. Stanley Librach - BLOC | $40,000.00 | Ryan Graziano | Closed Lost - No Contact | 6/14/2023 | | | Working Capital | |
| 5 | Dr. Stanley Librach - 125k Exion | $137,512.50 | Christopher Hagmaier | Closed Lost - Inactive | 3/15/2024 | MMP Capital | NEC Financial | EFA | |
| 6 | Dr. Stanley Librach - 150k Emface | $164,497.00 | Christopher Hagmaier | Closed Lost - Inactive | 3/18/2024 | MMP Capital | Balboa Capital | EFA | |
| 7 | Dr. Stanley Librach - 50K Ted | $53,415.31 | Anthony Mauri | Closed Won | 3/18/2024 | MMP Capital | MMP Capital | EFA | Default - Pai |
| 8 | Dr. Stanley Librach - 75K Harmony | $79,471.56 | Anthony Mauri | Closed Won | 3/20/2024 | MMP Capital | MMP Capital | EFA | Default - Pai |
| 9 | Dr. Stanley Librach - 150K Beautifill | $157,640.31 | Anthony Mauri | Closed Lost - Inactive | 3/28/2024 | MMP Capital | Balboa Capital | EFA | |
| 10 | Dr. Stanley Librach - 125K Opus | $131,584.06 | Anthony Mauri | Closed Lost - Other | 4/8/2024 | MMP Capital | NEC Financial | EFA | Current |

mmpcapital.lightning.force.com/lightning/r/Account/0015b00001nyHa7AAE/related/Opportunities/view?ws=%2Flightning%2Fr%2FAccount%2F0015b00001nyHa7AAE%2F...

Sales Console | Dashboards | MMP Capital Team D... | Deutsche Bank: Pled... | Naples Direct Medic... | Dr. Mary Anne Farris ...

It looks as if duplicates exist for this Account. View Duplicates

Accounts > Dr. Mary Anne Farris **

**Opportunities**

6 items • Sorted by Close Date • Updated a few seconds ago

| | Opportunity Name | Total Amo... | Opportunity Manager | Stage | Close D... | Underwriter | Assignee | Product Type | Payment S... |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Dr. Mary Anne Farris - 289k Emsculpt Neo | $310,610.30 | Christopher Hagmaier | Closed Lost - No Contact | 6/30/2021 | MMP Capital | Amur Equipment Fina... | EFA | Current |
| 2 | Dr. Mary Anne Farris - 200k Emsculpt Neo | $213,440.00 | Christopher Hagmaier | Closed Won | 9/28/2022 | Amur Equipment Finan... | Amur Equipment Fina... | EFA | Past Due - D |
| 3 | Dr. Mary Anne Farris - 180K Elite IQ | $192,895.00 | Michael Mauri | Closed Won | 11/29/2022 | MMP Capital | North Mill Equipment ... | EFA | Default - Re |
| 4 | Dr. Mary Anne Farris - 149k Cellutone | $158,585.00 | Christopher Hagmaier | Closed Lost | 12/13/2022 | MMP Capital | Dext Capital | EFA | |
| 5 | Dr. Mary Anne Farris - 161K Optimas | $170,710.00 | Shamus Naughton | Closed Won | 12/20/2022 | MMP Capital | MMP Capital | EFA | Default - In |
| 6 | Dr. Mary Anne Farris - 70k Potenza | $75,916.50 | Michael Mauri | Closed Lost - No Purchase | 2/1/2023 | | | EFA | |

History | Recent Items | Messenger | To Do List

mmpcapital.lightning.force.com/lightning/r/Account/0010a00001dk7wCAAQ/related/Opportunities/view?ws=%2Flightning%2Fr%2FAccount%2F0010a00001dk7wCAAQ%2...

Sales Console | Dashboards | MMP Capital Team D... | Deutsche Bank: Pled... | Dr. Harlan South | Ac...

Accounts > Dr. Harlan South

**Opportunities**

6 items • Sorted by Close Date • Updated a few seconds ago

| | Opportunity Name | Total Amo... | Opportunity Manager | Stage | Close D... | Underwriter | Assignee | Product Type | Payment S... |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Dr. Harlan South - 35K Zimmer | $35,000.00 | Mike McCaffrey | Closed Lost - No Purchase | 4/13/2020 | Amur Equipment Finan... | | EFA | |
| 2 | Dr. Harlan South - 25K Emage Imaging Solution | $25,002.32 | Sean Etherson | Closed Won | 1/27/2022 | MMP Capital | Balboa Capital | EFA | Current |
| 3 | Dr. Harlan South - 199k Emsculpt Neo | $217,553.75 | Christopher Hagmaier | Closed Won | 9/30/2022 | Amur Equipment Finan... | Amur Equipment Fina... | EFA | Default - In |
| 4 | Dr. Harlan South - 108K V30 | $108,427.35 | Sean Etherson | Closed Won | 10/27/2022 | MMP Capital | Balboa Capital | EFA | Current |
| 5 | Dr. Harlan South - 25.8K Working Capital | $25,895.77 | Sean Etherson | Closed Won | 1/19/2023 | Can Capital | | Working Capital | Current |
| 6 | Dr. Harlan South - Loan (Collateral) | $1,500.00 | Sean Etherson | Closed Lost - Credit | 3/31/2023 | | | SBA | |

History | Recent Items | Messenger | To Do List

mmpcapital.lightning.force.com/lightning/r/Account/0010a00001VtsWbAAJ/related/Opportunities/view?ws=%2Flightning%2Fr%2FAccount%2F0010a00001VtsWbAAJ%2Fv...

Sales Console

Accounts > Dr. Wayne Wertheim

**Opportunities**

4 Items • Sorted by Close Date • Updated a few seconds ago

| | Opportunity Name | Total Amo... | Opportunity Manager | Stage | Close D... | Underwriter | Assignee | Product Type | Payment S... |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Dr. Wayne Wertheim- 179k Emsculpt | $195,731.39 | Christopher Hagmaier | Closed Lost - Credit | 12/31/2018 | Balboa Capital | | | |
| 2 | Dr. Wayne Wertheim - 150k Cellutone | $163,583.82 | Christopher Hagmaier | Closed Won | 11/29/2022 | Amur Equipment Finan... | Amur Equipment Fina... | EFA | Past Due - L |
| 3 | Dr. Wayne Wertheim - 60k Cellutone | $65,821.32 | Christopher Hagmaier | Closed Lost | 1/19/2023 | MMP Capital | Dext Capital | EFA | |
| 4 | Dr. Wayne Wetheim - 150k Cellutone | $163,583.82 | Christopher Hagmaier | Closed Lost | 1/23/2023 | Centra Funding | | EFA | |

mmpcapital.lightning.force.com/lightning/r/Account/001Rm00000DVmLsIAL/related/Opportunities/view?ws=%2Flightning%2Fr%2FAccount%2F001Rm00000DVmLsIAL%2F...

Sales Console

Accounts > Jeffrey Bourguignon DC

**Opportunities**

3 Items • Sorted by Close Date • Updated a few seconds ago

| | Opportunity Name | Total Amo... | Opportunity Manager | Stage | Close D... | Underwriter | Assignee | Product Type | Payment S... |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Jeffrey Bourguignon DC - 200k Emsculpt Neo | $213,565.00 | Christopher Hagmaier | Closed Lost - Inactive | 6/30/2024 | Amur Equipment Finan... | Amur Equipment Fina... | EFA | |
| 2 | Jeffrey Bourguignon DC - 150k Emtone | $162,851.75 | Christopher Hagmaier | Closed Lost - Competitor | 8/21/2024 | MMP Capital | NEC Financial | EFA | |
| 3 | Jeffrey Bourguignon DC - 200k Emsculpt Neo & Cellutone | $213,535.00 | Christopher Hagmaier | Closed Won | 10/25/2024 | Amur Equipment Finan... | Amur Equipment Fina... | EFA | Current |

**John-Paul M. Smolenski**
President & CEO

**e:** jp@mmpcapital.com
**o:** (516) 454-4572 | **m:** (516) 606-8354 | **f:** (516) 400-2071

***"Success is not owned, it's leased, and rent is due everyday." – J.J. Watt***

APPLY HERE

Forbes | Finance Council — 2024 OFFICIAL MEMBER

NEFA ELFA

BBB A+ Rating BUSINESSNEWS




| | Opportunity Name | Total Amo... | Opportunity Manager | Stage | Close D... | Underwriter | Assignee | Product Type | Payment S... |
|---|---|---|---|---|---|---|---|---|---|
| 1 | James Rippa DC - 275k Emsculpt Neo | $243,065.00 | Christopher Hagmaier | Closed Won | 10/29/2024 | Amur Equipment Finan... | Amur Equipment Fina... | EFA | Current |
| 2 | James Rippa DC - 150k Emsella | $160,565.00 | Christopher Hagmaier | Closed Lost - No Purchase | 11/14/2024 | MMP Capital | MMP Capital | EFA | |

Opportunities | Sa · Team Pipeline Re · Team Funded Pip · Alma - Funded P · Term SOFR - CME · (27) George Atkin · Account: Dr. Char

mmpcapital.lightning.force.com/lightning/r/Account/001Rm00000K3G9ZIAV/related/Opportunities/view?ws=%2Flightning%2Fr%2FAccount%2F001Rm00000K3G9ZIAV%2F...

TVal · MD License · DocInfo · SalesForce · Forte · Dex · PayNet · Experian · Deutsche Bank · Chase · Signature · TLO · SOFR · NMEF Portal · Alma Calc.

Search...

Sales Console · Dashboards · MMP Cap... · Deutsche ... · Beata Sim... · Maureen ... · Island Me... · Tiffany Ja... · Dr. Orlan... · More

Beata Simon DDS... · Opportu...

Accounts > Beata Simon DDS

## Opportunities

New

1 item • Sorted by Close Date • Updated a few seconds ago

| | Opportunity Name | Total Amo... | Opportunity Manager | Stage | Close D... | Underwriter | Assignee | Product Type | Payment S... |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Beata Carlson DDS - 349k Emface | $311,480.00 | Christopher Hagmaier | Closed Won | 9/27/2024 | Amur Equipment Finan... | Amur Equipment Fina... | EFA | Current |

https://mmpcapital.lightning.force.com/lightning/r/Account/001Rm00000K3G9ZIAV/view?0.source=alohaHeader

Opportunities | Sa · Team Pipeline Re · Team Funded Pip · Alma - Funded P · Term SOFR - CME · (27) George Atkin · Account: Dr. Char

mmpcapital.lightning.force.com/lightning/r/Account/001Rm00000JGVktIAH/related/Opportunities/view?ws=%2Flightning%2Fr%2FAccount%2F001Rm00000JGVktIAH%2Fvi...

TVal · MD License · DocInfo · SalesForce · Forte · Dex · PayNet · Experian · Deutsche Bank · Chase · Signature · TLO · SOFR · NMEF Portal · Alma Calc.

Search...

Sales Console · Dashboards · MMP Cap... · Deutsche ... · Maureen ... · Island Me... · Tiffany Ja... · Dr. Orlan... · Dr. Fritz L... · More

Maureen O'Flana... · Opportu...

Accounts > Maureen O'Flanagan DDS

## Opportunities

New

2 items • Sorted by Close Date • Updated a few seconds ago

| | Opportunity Name | Total Amo... | Opportunity Manager | Stage | Close D... | Underwriter | Assignee | Product Type | Payment S... |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Maureen O'Flanagan DDS - 250k Exion **FTL Event** | $266,990.00 | Christopher Hagmaier | Closed Won | 9/18/2024 | Amur Equipment Finan... | Amur Equipment Fina... | EFA | Current |
| 2 | Maureen O'Flanagan DDS - 150k Exion | $160,840.00 | Christopher Hagmaier | Closed Lost - Inactive | 12/8/2024 | MMP Capital | Falcon Equipment Fina... | EFA | |

History · Recent Items · Messenger · To Do List

Opportunities | Sa | Team Pipeline Re | Team Funded Pip | Alma - Funded Pi | Term SOFR - CME | (27) George Atkin | Account: Dr. Char

mmpcapital.lightning.force.com/lightning/r/Account/001Rm00000lwu2fIAB/related/Opportunities/view?ws=%2Flightning%2Fr%2FAccount%2F001Rm00000lwu2fIAB%2Fvi...

TV TVal | MD License | DocInfo | SalesForce | Forte | Dex | PayNet | Experian | Deutsche Bank | Chase | Signature | TLO | SOFR | NMEF Portal | Alma Calc.

Search...

Sales Console | Dashboards | MMP Capital Team D... | Deutsche Bank Pled... | Ivan Bracic DC | Acco...

Ivan Bracic DC | A... | Opportu...

Accounts > Ivan Bracic DC

## Opportunities

3 Items • Sorted by Close Date • Updated a few seconds ago

New

| | Opportunity Name | Total Amo... | Opportunity Manager | Stage | Close D... | Underwriter | Assignee | Product Type | Payment S... |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Ivan Bracic DC - 289k Emsculpt Neo | $307,855.00 | Christopher Hagmaier | Closed Won | 8/30/2024 | Amur Equipment Finan... | Amur Equipment Fina... | EFA | Current |
| 2 | Ivan Bracic DC - 125k Exion **DMV EVENT** | $109,515.00 | Christopher Hagmaier | Closed Won | 10/22/2024 | MMP Capital | North Mill Equipment ... | EFA | Current |
| 3 | Ivan Bracic DC - 175k Emface *DMV EVENT** | $162,015.00 | Christopher Hagmaier | Closed Won | 10/22/2024 | MMP Capital | MMP-DB | EFA | Current |

https://mmpcapital.lightning.force.com/lightning/r/Account/001Rm00000lwu2fIAB/view?0.source=alohaHeader

Opportunities | Sa | Team Pipeline Re | Team Funded Pip | Alma - Funded Pi | Term SOFR - CME | (27) George Atkin | Account: Dr. Char

mmpcapital.lightning.force.com/lightning/r/Account/0015b000023cCE7AAM/related/Opportunities/view?ws=%2Flightning%2Fr%2FAccount%2F0015b000023cCE7AAM%2...

TV TVal | MD License | DocInfo | SalesForce | Forte | Dex | PayNet | Experian | Deutsche Bank | Chase | Signature | TLO | SOFR | NMEF Portal | Alma Calc.

Search...

Sales Console | Dashboards | MMP Capit... | Deutsche B... | Dr. Mark Ba... | Shruti Panji... | Margaret N... | Dr. David D... | Ivan Bracic ...

Dr. Mark Barrow ... | Opportu...

Accounts > Dr. Mark Barrow Sr. (Account in Legal – Do Not Solicit)

## Opportunities

7 Items • Sorted by Close Date • Updated a few seconds ago

New

| | Opportunity Name | Total Amo... | Opportunity Manager | Stage | Close D... | Underwriter | Assignee | Product Type | Payment S... |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Dr. Mark Barrow Sr. - 99k Cellutone | $105,610.00 | Christopher Hagmaier | Closed Lost - Competitor | 10/19/2022 | MMP Capital | Balboa Capital | EFA | |
| 2 | Dr. Mark Barrow Sr. - 250k Emsculpt Neo | $247,465.00 | Christopher Hagmaier | Closed Won | 12/29/2022 | MMP Capital | North Mill Equipment ... | EFA | Past Due - L |
| 3 | Dr. Mark Barrow Sr. - 149k Cellutone **ORLANDO EVENT** | $143,610.00 | Christopher Hagmaier | Closed Won | 5/16/2023 | Amur Equipment Finan... | Amur Equipment Fina... | EFA | Default - Re |
| 4 | Dr. Mark Barrow Sr. - 200k Emface **ORLANDO EVENT** | $203,465.00 | Christopher Hagmaier | Closed Won | 5/24/2023 | Me and My Pal | Flagstar (Signature) | EFA | Default - In |
| 5 | Amy Brumfield PA - 150k Emtone | $160,265.00 | Christopher Hagmaier | Closed Lost - Other | 5/28/2023 | | | EFA | |
| 6 | Amy Brumfield PA - SBA Loan | $600,000.00 | Ryan Graziano | Closed Lost - No Purchase | 9/8/2023 | | | SBA | |
| 7 | Dr. Mark Barrow Sr. - 150k Exion | $160,665.00 | Christopher Hagmaier | Closed Lost - Inactive | 11/5/2023 | | | EFA | |

History | Recent Items | Messenger | To Do List



Accounts > Dr. William McGrogan

Opportunities

7 Items • Sorted by Close Date • Updated a few seconds ago

| | Opportunity Name | Total Amo... | Opportunity Manager | Stage | Close D... | Underwriter | Assignee | Product Type | Payment S... |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Dr. William McGrogan - 250k Emsella | $266,265.00 | Christopher Hagmaier | Closed Won | 3/31/2023 | Amur Equipment Finan... | Amur Equipment Fina... | EFA | Past Due |
| 2 | Dr. William McGrogan - 250k Emsculpt Neo | $266,465.00 | Christopher Hagmaier | Customer Default | 4/11/2023 | MMP Capital | North Mill Equipment ... | EFA | Default - Re |
| 3 | Dr. William McGrogan - 200k Emface **ORLANDO EVENT** | $185,465.00 | Christopher Hagmaier | Customer Default | 5/22/2023 | MMP Capital | MMP Capital | EFA | Default - In |
| 4 | Dr. William McGrogan - 149k Cellutone **ORLANDO EVENT... | $146,610.00 | Christopher Hagmaier | Closed Won | 5/31/2023 | Me and My Pal | Flagstar (Signature) | EFA | Default - Re |
| 5 | Dr. William McGrogan - 200k Emface **ORLANDO EVENT** | $201,402.75 | Christopher Hagmaier | Closed Lost - Other | 6/20/2023 | Me and My Pal | Flagstar (Signature) | EFA | |
| 6 | Dr. William McGrogan - 150k Exion **HOLLYWOOD EVENT** | $160,565.00 | Christopher Hagmaier | Closed Lost - Inactive | 11/22/2023 | | NEC Financial | EFA | |
| 7 | Dr. William McGrogan - 100k Cellutone | $106,670.00 | Christopher Hagmaier | Closed Lost - Inactive | 11/22/2023 | | | EFA | |

**From:** Todd Wainwright <TWainwright@amuref.com>
**Sent:** Monday, November 11, 2024 1:35 PM
**To:** John-Paul M. Smolenski <jp@mmpcapital.com>
**Cc:** Todd Wainwright <TWainwright@amuref.com>
**Subject:** Potential split transactions review follow up

JP –

As a follow up to our prior conversation, attached is a list of additional transactions that Andrea and the team have identified as split transactions using UCC filings. The data set they reviewed consists of:

- Transactions originated after 8/1/24 (this was around the date of the prior buybacks that MMP completed with Amur)
- Charge offs (as identified) – note: the C/O figure does not incorporate any recovery which would obviously be adjusted for
- Currently delinquent transactions

While this isn't necessarily a complete list of split transactions, it should serve as a significant starting point to a conversation to discuss a go-forward strategy. We should plan to sit down as soon as possible to try to find a workable path forward and will of course review any evidence that any of these transactions were not split. The rest of our exec team is open on Friday 11/22 if we could schedule time in our White Plains office to meet. Let me know as soon as you can on that date so we can get it on the calendar.

Side note – I see Dale will be at the NEFA conference in Indy this week – any chance you'll be in attendance?

Talk soon,

Todd

Todd Wainwright
Senior Vice President, Head of Commerce & Strategic Partnerships
*direct* 308-398-7180
*fax* 308 398-7180
*toll free* 800-994-0016 ext. 2400
TWainwright@amuref.com
www.goamur.com

AMUR

Schedule Time

Legal Disclaimer: The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the Sender immediately by replying to the message and delete this email from your system.

**MMP Capital**

| Contract | Customer Name | Booking Date | Aging Status Nov-2024 | Amount | NBV | Vendor | Situation | Aging Status 11/3/242 | Oldest Rent | Additional Exposure | Payment Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1223367 | Revival Health Group, P.A. | 10/29/2024 | Active | | $272,967 | BTL Industries, Inc. | Other UCCs filed on same day as Amur's | Current | 11/15/2024 | No | Current |
| 1225821 | Tampa Sports & Wellness Chiropractic, LLC | 10/25/2024 | Active | | $240,404 | BTL Industries, Inc. | Other lender (Marlin Leasing) within 4 days of Amur's filing | Current | 11/15/2024 | No | Current |
| 1219152 | IV Essentials LLC | 9/27/2024 | Active | | $349,780 | BTL Industries, Inc. | Other filing under Guarantor name for the same filing date | Current | 11/15/2024 | No | Current |
| 1219833 | Maureen Louise O'Flanagan, D.D.S., P.A. | 9/18/2024 | Active | | $295,436 | BTL Industries, Inc. | Other UCC with Marlin Leasing Corp within 6 days of Amur's UCC filing | Current | 11/15/2024 | No | Current |
| 1217045 | Southwest Florida Spine and Joint Inc | 8/30/2024 | Active | | $351,384 | BTL Industries, Inc. | Other UCC with Marlin Leasing Corp on same day as Amur's UCC filing | Current | 11/15/2024 | Yes, but 2 months later. | Current |
| 1202248 | Shenandoah Medical Care Center "LLC" | 6/11/2024 | Active | $235,902 | $235,902 | BTL Industries, Inc. | UCC filing on the same day for Amur and North Mill. Also, more filings in the months prior and subsequent to ours. On 10/28/24, notified us ofintent to surrender four pieces of equipment financed in mid-2024: Emsella (NMEF), Emsculpt Neo tower (Amur), Exion/Emface (MMP) and Cellutone (Dext Capital). | 31-60 days | 10/1/2024 | Yes. MMP did a combo deal with NMEF and Amur. | Past Due - Legal |
| 1187962 | Indigo Medicine, LLC | 3/22/2024 | Active | $235,684 | $235,684 | BTL Industries, Inc. | UCC by North Mill filed on same date as Amur; Customer filed suit against MMP/BTL | Current | 12/15/2024 | Yes. Combo w/ NMEF. | Current |
| 1175480 | Dominick P. Artuso M.D., P.C. | 3/14/2024 | Active | $288,487 | $288,487 | BTL Industries, Inc. | North Mill filed UCC same day as Amur | 30-60 days | 10/1/2024 | Yes. Combo w. NMEF | Current |
| 1172135 | Margaret Novicio D.D.S., Professional Corporation | 12/28/2023 | Active | $205,157 | $205,157 | BTL Industries, Inc. | UCC filing with HIL financial on same day. Paynet showing financed equipment. | Current | 12/15/2024 | Yes. Combo w/ NMEF. | Current |
| 1173382 | Shruti Panjini, DDS, P.C. | 12/26/2023 | Active | $256,677 | $256,677 | BTL Industries, Inc. | PG filed for Ch. 7. Website of dental practice (now allegedly closed) advertises BTL Emface financed by Amur and BTL Exion. UCC filings from Amur and North Mill on same date 12/20/23; POC also proves MMP handled both Contracts | 11-30 days | 10/15/2024 | Yes. Combo w/ NMEF | BK |
| 1149042 | Serene Dental Solutions, LLC | 8/17/2023 | Active | $290,818 | $290,818 | BTL Industries, Inc. | UCC with North Mill filed on same day | 30-60 days | 9/15/2024 | Yes. Combo w/ NMEF | Past Due |
| 1123758 | Seabreeze Medical, P.A. | 5/16/2023 | Charged-off | | $167,186 | BTL Industries, Inc. | Additional UCC filings within days of Amur | BADDEBT | 5/15/2024 | Have 4 Levels of Exposure, but not simultaneous. | Legal - Customer is going to lose in court. |
| 1131793 | John R. Kearney, M.D., Eye Physician And Surgeon, P.C. | 4/28/2023 | Active | $223,594 | $223,594 | BTL Industries, Inc. | MMP/North Mill filed 8 days after Amur's filing | Current | 11/15/2024 | Yes. Combo w/ NMEF | Legal w/ NMEF. |
| 1128877 | William F. McGrogan, M.D. PLLC | 3/31/2023 | Active | $289,051 | $289,051 | BTL Industries, Inc. | Multiple UCC's filed w/ MMP, Signature, and North Mill at the same time as Amur's filing. | 31-60 days | 9/15/2024 | Yes. Not simultaneous | |
| 1125029 | Personal Healthcare Of Naples LLC | 3/21/2023 | Charged-off | $214,049 | $214,049 | BTL Industries, Inc. | North Mill/MMP Capital have filings around same day | RECOVEREDASSET | 12/1/2024 | Yes. Combo w/ NMEF. | |
| 1121335 | Internal Medicine Prime Care LLC | 2/28/2023 | Charged-off | $109,776 | $109,776 | BTL Industries, Inc. | UCC filing with North Mill within a couple days of Amur's filing | BADDEBT | 11/15/2024 | Yes. Combo w/ NMEF | |
| 1121114 | East Carolina Optometric Care, PA | 2/21/2023 | Charged-off | $153,727 | $153,727 | BTL Industries, Inc. | Amur contract signed 2/10/23 - cellutone workstation. MMP split transactions between North Mill and Amur. Third Party Complaint filed against North Mill, Amur, BTL, MMP seeking relief and damages. Both contracts signed February 10, 2023. | BADDEBT | 8/1/2024 | Yes. Combo w/ NMEF | Customer in legal, trying to back out of the deal. |
| 1105124 | Island Medical Laser, P.C. | 11/28/2022 | Charged-off | | $169,840 | BTL Industries, Inc. | Cellutone machine; UCC lists a BTL Emface system (usually part of the Cellutone package) financed at around the same time. | RECOVEREDASSET | 11/15/2024 | No. | |
| 1101004 | Premier Wellness & Aesthetics Center, PC | 9/29/2022 | Charged-off | | $278,856 | BTL Industries, Inc. | ReadyCap Lending, LLC filed 2 days after Amur's filing, appears to be a blanket lien filing. | BADDEBT | 12/15/2024 | No. | |
| 1100293 | Naples Direct Medical PLLC | 9/27/2022 | Charged-off | | $214,896 | BTL Industries, Inc. | Amur contract signed 9/17/22 (@Andrea, Dext with MMP/Lumeris signed a contract 9/17/22-found on Center for Alternative Medicine | RECOVEREDASSET | 1/15/2024 | No. | |
| 1101013 | William V. Choisser, M.D. P.A. | 9/22/2022 | Active | $86,346 | $86,346 | BTL Industries, Inc. | Amur filed UCC on 9/22/22 for Cellutone; North Mill filed on the same day, Signature Bank UCC on 9/20/22, Leaf Capital on 9/27/22 | Current | 11/15/2024 | Yes. Combo w/ NMEF | |

| Contract | Customer Name | Booking Date | Aging Status Nov-2024 | Amount | NBV | Vendor | Situation | Aging Status 11/3/242 | Oldest Rent | Additional Exposure | Payment Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1055636 | Center For Alternative Medicine, PLLC | 8/24/2022 | Charged-off | | $272,707 | BTL Industries, Inc. | Amur contract signed 8/6/22 (Dext with MMP/Lumeris signed 9/17/22; NEC two contracts signed 2/2/23 with MMP/BTL; Northmill MMP/BTL signed 12/20/20) UCC filings by Amur and Dext on same date 8/9/22 | BADDEBT | 10/15/2023 | Yes. Combo w/ NEC Financial. This customer defrauded Dr. Kerry Latch, and ran up all his debts, and went off the grid. | |
| 1088953 | Stanley Librach, M.D., D.D.S., LLC | 8/5/2022 | Active | | $210,082 | BTL Industries, Inc. | MMP filed UCC 6 days prior to Amur. Customer confirmed there were 3 machines financed with MMP at the same time. Amur contract signed 6/27/22 | 11-30 days | 10/15/2024 | No. Simultaneous debt over a period of time. MD went to jail about 3 months ago and defaulted on all EFA's. | |
| 1084810 | Allyson Berkey MD PC | 6/29/2022 | Active | $104,126 | $104,126 | BTL Industries, Inc. | Amur contract signed 6/15/22 and UCC filed on 6/20 for an Emsella. NorthMill filed a UCC on 6/16 most likely for an Emsculpt; once we confirm NorthMill's contact was originated by MMP, it will qualify for buyback. | Current | 12/15/2024 | Yes. Combo w/ NMEF. | |
| 1080831 | Derek L. Martin, DMD, Inc. | 6/16/2022 | Active | $205,326 | $205,326 | BTL Industries, Inc. | North Mill filed UCC same day | 11-30 days | 10/15/2024 | Yes. Combo w/ NMEF. | |
| 1078062 | Ryan Francis Ramos MD PLLC | 6/15/2022 | Charged-off | | $247,325 | BTL Industries, Inc. | MMP/North Mill filed UCC same day | BADDEBT | 11/15/2024 | No. Exposure outside of same period. | |
| 1083209 | Genera Health Direct LLC | 6/7/2022 | Charged-off | $114,173 | $114,173 | BTL Industries, Inc. | North Mill/MMP filed same day | BADDEBT | 11/1/2023 | Yes. Combo deal with NMEF. | |
| 1081988 | MyMD Direct, PLLC | 6/2/2022 | Charged-off | $218,252 | $218,252 | BTL Industries, Inc. | Amur contract signed 5/20/2022; Signature Financial MMP/BTL POC signed 6/16/2022; North Mill MMP/BTL POC signed 5/18/2022 | RECOVEREDASSET | 3/1/2023 | Yes. Combo w/ NMEF and Flagstar in the same month. | |
| 1074381 | Utopic Health Pllc | 4/15/2022 | Charged-off | | $236,941 | BTL Industries, Inc. | Amur UCC filed 4/14/2022, POC filing in Medical Healing Center shows North Mill contract signed 4/9/22 | RECOVEREDASSET | 6/15/2024 | No. | |
| 1070992 | The Health Studio & IV Spa, LLC | 4/5/2022 | Active | | $92,231 | BTL Industries, Inc. | North Mill/MMP filed UCC same day | 31-60 days | 10/1/2024 | Combo deal. Customer went through a divorce, and is on hardship deferral with MMP, and will come back and get | |
| 1057421 | Infinity Orthodontics P.C. | 2/1/2022 | Active | $127,475 | $127,475 | BTL Industries, Inc. | UCC filing for MMP same date as Amur 2/1/2022 - appears to be assigned to North Mill | 31-60 days | 10/1/2024 | Combo deal w/ NMEF a few days later. | |
| 1058967 | Full Motion Orthopaedics & Wellness Center, LLC | 1/25/2022 | Active | $169,531 | $169,531 | BTL Industries, Inc. | North Mill/MMP filed same day as Amur | 120+ | 5/15/2024 | Combo deal w/ NMEF. | |
| 1051166 | The Bienetre Center LLC | 12/15/2021 | Charged-off | | $181,436 | BTL Industries, Inc. | UCCs filed around the same time as Amurs-Legal-Kye | RECOVEREDASSET | 9/15/2023 | No. | |
| 1049701 | Cosmo Contour & Spa LLC | 11/30/2021 | Charged-off | | $180,140 | BTL Industries, Inc. | MMP filed within a day of Amur's filing | RECOVEREDASSET | 7/15/2024 | No. | |
| 1049573 | Medical Healing Center, LLC | 11/30/2021 | Charged-off | | $135,980 | BTL Industries, Inc. | Amur contract signed 10/26/21; Dext Capital MMP/BTL POC filed - contract signed 10/26/21/ North Mill MMP/BTL POC filed - signed 10/26/21 / North Mill MMP/BTL POC filed - signed 4/9/22; Balboa MMP/BTL POC filed signed 12/6/21 | BADDEBT | 6/1/2024 | No. Customer purchased a 2nd device 2 weeks later and financed with NMEF. Then financed again a 3rd device 2 weeks after that. Than again 3 months later. None of the deals were combo deals. Customer got diagnosed with cancer, and shut down her practice. | |
| 1048619 | The Beauty Clinic, Inc. | 11/5/2021 | Active | | $170,904 | BTL Industries, Inc. | Amur contract signed 10/20/21 (within 6 days of Medical Healing Center Contracts) | Current | 12/1/2024 | No. Customer purchased a 2nd device 2 weeks later with another vendor. Not a combo deal. | |
| 1041062 | Uptown Medispa - Arrowhead LLC | 10/1/2021 | Active | | $111,947 | BTL Industries, Inc. | Amur contract signed 9/2/21. Quality Leasing signed on 9/7/21. Subsequent financings from North Mill and others. | Current | 12/1/2024 | No. Customer purchased a 2nd device 1 week later with Amur on a discount after having early success with the Neo. Purchased a 3rd device 3 months later. Current on all other | |
| 1044665 | Samantha S. Lindsay, M.D., P.A. | 9/29/2021 | Charged-off | $202,890 | $202,890 | BTL Industries, Inc. | Amur contract signed 9/18/21; Flagstar and North Mill contracts signed 9/18/21 (found from Winter Garden bk) | BADDEBT | 11/15/2022 | Combo deal with NMEF. | |
| 1032913 | Donald G Blaschke II, M.D. | 8/17/2021 | Charged-off | | $174,683 | BTL Industries, Inc. | Amur contract signed 6/27/21 - Another contract signed 6/26/2021 BTL as vendor for an Emsculpt Neo Workstation (assume North Mill as copy of check payable to North Mill) | BADDEBT | 6/1/2022 | Customer purchased 2 other devices at a huge discount after purchasing his Emsculpt Neo. Customer didn't do as well as anticipated, and fabricated stories to try to get out of the deal. MMP was lumped into a lawsuit with NMEF, and customer lost bc he his claims were frivolous, without merit, | |
| 1036445 | Wayne P. Justice, M.D., P.A. | 8/9/2021 | Charged-off | $220,177 | $220,177 | BTL Industries, Inc. | North Mill filed within days of Amur's filing | RECOVEREDASSET | 4/1/2024 | Combo deal with NMEF. | |
| 1029822 | Specialty Solutions, LLC | 7/28/2021 | Charged-off | $94,569 | $94,569 | BTL Industries, Inc. | North Mill filed within days of Amur's filing | BADDEBT | 2/15/2024 | Combo deal with NMEF. | |
| 1030836 | Bespoke Wellness LLC | 7/6/2021 | Active | $56,459 | $56,459 | BTL Industries, Inc. | North Mill / MMP filings on same day | 11-30 days | 10/15/2024 | Customer made frivolous claims against MMP, and all claims were thrownout. Customer is current with all other sources. | |
| 1027914 | TMMD LLC | 6/8/2021 | Charged-off | $142,212 | $142,212 | BTL Industries, Inc. | North Mill filed within days of Amur's filing | BADDEBT | 8/1/2024 | Combo deal with NMEF. | |
| 1027925 | VivaMD LLC | 6/8/2021 | Charged-off | $84,112 | $84,112 | BTL Industries, Inc. | I believe we can collect the rest of this one through KYE, balance on account is only showing $26,872.71. North Mill filed UCC within a couple days of Amur's filing | RECOVEREDASSET | 10/1/2022 | Combo deal with NMEF. | |

| Contract | Customer Name | Booking Date | Aging Status Nov-2024 | Amount | NBV | Vendor | Situation | Aging Status 11/3/242 | Oldest Rent | Additional Exposure | Payment Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1026146 | Total Woman Healthcare, P.A. | 5/26/2021 | Active | $115,885 | $115,885 | BTL Industries, Inc. | MMP/Leasepoint have UCC filings within days of Amur's filing | Current | 12/15/2024 | Combo deal with NMEF. | |
| 1014853 | Island Family Health LLC | 3/2/2021 | Charged-off | $53,506 | $53,506 | BTL Industries, Inc. | Amur Contract signed 2/17/21 / Northmill filed POC-contract with MMP/BTL signed 2/23/21 (Other POCs filed: MMP filed POC-contract signed 7/2022 / Flagstar Financial w/MMP filed POC-contract signed 5/26/21 / Northmill filed POC-contract with MMP signed 3/7/23) | BADDEBT | 4/1/2024 | Combo deal with NMEF. Cusomter was doing over 2.5mm per year, and hired an attorney to try and wiggle out of contracts to make more money. Filed for BK, got declined, MMP holds debt with PG as well, and will collect once settled. | |
| | | | | $4,497,960.00 | | | | | | | |

# EXHIBIT F

**Bill of Lading – Short Form – Not Negotiable**

**PO Number:** 37440140

| Ship From | |
|---|---|
| **AWAKEN FUNCTIONAL MEDICINE, PLLC**<br>[redacted] | **Pickup Date:** 7/14/2026<br>**Carrier:** TQL |

| Ship To | References |
|---|---|
| **Aesthetic Laser City**<br>**135 Maxess Road Suite D**<br>**Melville, NY 11747** | Customer PO: **C097706-A124352**<br>Pickup #: Serial# 89900B004137<br>Delivery PO#: Serial# 89900B004137 |

**Special Instructions: FOLLOW RATE CONFIRMATION AND DRIVER INSTRUCTIONS**

**Accessorials:**

**Freight Terms:**

**Third Party:** __X__
**Collect:** _____
**Prepaid:** _____

| Qty | Type | Weight | Dims | NMFC | Item Description | LTL Class |
|---|---|---|---|---|---|---|
| 1 | UNIT | 150 | | | **2023 BTL Industries Emsculpt Neo Workstation** | N/A |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | **GRAND TOTALS:** | |

Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property as follows: "The agreed or declared value of the property is specifically stated by the shipper to be not exceeding ________________ per ______________."

**COD Amount:** $______________

**Fee Terms: Collect __ Prepaid __ Check Acceptable __**

**Note: Liability limitation for loss or damage in this shipment may be applicable. See 49 USC 14706(c)(1)(A) and (B).**

**For Freight Collect Shipments:**

If this shipment is to be delivered to the consignee, without recourse on the consignor, the consignor shall sign following statement: *The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges.*

Signature of Consignor: ______________________________

**Trailer Loaded:**

____ **By Shipper**
____ **By Driver**

**Freight Counted:**

____ **By Shipper**
____ **By Driver**

**Shipper Signature/Date**

This is to certify that above named materials are properly classified, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the DOT.

Shipper: *[signature]* Date: 14 JUL 2026

**Carrier Signature/Pickup Date:**

Carrier acknowledges receipt of packages and required placards. Carrier certifies emergency response information was made available and/or carrier has the DOT emergency response guidebook or equivalent documentation in the vehicle. Property described above is received in good order, except as noted.

Carrier: *[signature]* Date: 7-14-2026